**John MALLICK, Appellant**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, et al.**

No. 83–2200.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 1984.
Decided Nov. 27, 1984.

MacKinnon, Senior Circuit Judge, filed concurring opinion.

Paul Alan Levy, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on brief, for appellant.

John P. Counts, Washington, D.C., for appellees.

Before WRIGHT and WALD, Circuit Judges, and MACKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

Concurring opinion filed by Senior Circuit Judge MACKINNON.

WALD, Circuit Judge.

■ John Mallick appeals from a summary judgment dismissing his action against his union, the International Brotherhood of Electrical Workers (IBEW), and two IBEW officers under the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401–531.[1]

---

**1.** Mallick was the sole plaintiff under the original complaint. In their answer, the defendants argued that Mallick, as a retired electrician on a union pension, was not a member of the IBEW and lacked "standing" to bring an action under the LMRDA. *See* LMRDA § 3(*o*), 29 U.S.C. § 402(*o*) (defining "member"). Mallick later moved to amend his complaint by adding two presently active union members as plaintiffs, but the district court never ruled on the motion. The parties have not argued the question of standing on appeal, but because it implicates our jurisdiction, we raise it ourselves.

Article III requires a complainant to show that he has suffered some actual or threatened injury as a result of the putatively illegal conduct; that the injury fairly can be traced to the challenged action; and that the injury is likely to be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). "The actual or threatened injury ... may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing ....'" *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536

Mallick sought the right, as a union member, to examine IBEW financial records detailing the amount of a settlement and the attorneys' fees the IBEW paid in independent litigation to which he was not a party. Mallick relied in part on subsection 201(c) of the LMRDA, 29 U.S.C. § 431(c), which requires a union to permit a member "for just cause to examine any books, records, and accounts necessary to verify" certain reports that the union must file with the Secretary of Labor. The district court concluded that a union member may examine the records underlying the required union reports only if he can point to some irregularity or discrepancy in the reports themselves.[2] Because we take a broader view of subsection 201(c) than the district court, we vacate summary judgment on that claim and remand for further proceedings. Mallick also brought claims seeking the same information under subsections 501(a) and 101(a) of the LMRDA, 29 U.S.C. §§ 501(a), 411(a). Whatever

rights Mallick may have under subsection 501(a) on the facts of this case are no broader than his rights under subsection 201(c), and we therefore vacate summary judgment on the subsection 501(a) claim and direct the district court to base its judgment on subsection 201(c). We affirm summary judgment for the IBEW on the subsection 101(a) claims.

## I. BACKGROUND

This lawsuit involves decisions made by the IBEW in litigating an earlier action, *Boswell v. International Brotherhood of Electrical Workers*, Civ. No. 79–2571 (D.N.J. Mar. 2, 1981). Boswell, also an IBEW member, sued the union and two union officers, charging that he had been disciplined for acts protected by the free speech provisions of the LMRDA. Boswell requested actual and punitive damages, rescission of the disciplinary measures imposed on him, and equitable relief requiring

(1973)). There is no doubt that these requirements are satisfied. Mallick argues that the IBEW has unlawfully denied him his statutory right to inspect the records at issue in this case. Whether accurate or not, that allegation describes a direct injury to a putative legal right that is redressable by the courts. It therefore satisfies *Valley Forge*.

Decisions of this court have elaborated a further test for standing in statutory cases, known as the zone of interests test, under which a complainant must show "some indicia—however slight—that [he] was intended to be protected, benefited, or regulated by the statute under which suit is brought." *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury*, 679 F.2d 951, 952 (D.C.Cir.1982); *see also Autolog Corp. v. Regan*, 731 F.2d 25, 29–31 (D.C.Cir.1984); *American Friends Serv. Comm. v. Webster*, 720 F.2d 29, 49–52 (D.C.Cir.1983); *Control Data Corp. v. Baldrige*, 655 F.2d 283 (D.C.Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981). This principle derives largely from a line of Supreme Court cases distinguishing lack of standing, which occurs when a plaintiff is entirely outside the "zone," from failure to state a claim, which is a decision on the merits made after the court has assumed jurisdiction. *See Association of Data Processing Servs. Orgs., Inc. v. Camp*, 397 U.S. 150, 152–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970); *see also Duke Power Co. v. Carolina Envrtl. Study Group, Inc.*, 438 U.S. 59, 70, 98 S.Ct. 2620, 2628, 57 L.Ed.2d 595 (1978); *Baker v. Carr*, 369 U.S.

186, 204–08, 82 S.Ct. 691, 703–05, 7 L.Ed.2d 663 (1962); *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

Thus, the jurisdictional question is not whether Mallick is a union "member," and may properly bring this action. It is rather the threshold question of whether there are "some indicia—however slight" that he may do so. Plainly, there are such indicia. As a pensioned member, Mallick certainly has an interest in encouraging financially responsible practices by the IBEW, and a thoroughly plausible claim to be among those the LMRDA expressly authorizes to bring suit in defense of that interest. Without considering whether Mallick is a union "member"—and we intimate absolutely no view that he is not—or whether the additional plaintiffs named in the amended complaint are properly before us, we conclude that we have subject matter jurisdiction to decide this case.

**2.** *See Mallick v. International Bhd. of Elec. Workers*, No. 82–1075, slip op. at 2–3 (D.D.C. Feb. 13, 1984) [hereinafter cited as District Court Op.]. The district court relied on two related arguments. First, it held that the plaintiff had not identified any irregularity or discrepancy in the reports, and therefore did not satisfy the verification requirement. *Id.* Second, it held that a union member who seeks information about union expenditures in order to make those expenditures the subject of political debate within the union has not demonstrated "just cause." *Id.* at 3.

the removal from the IBEW constitution of allegedly unlawful provisions.[3]

The case was ultimately settled. As part of the settlement, the IBEW made changes in its constitution, and apparently paid Boswell a substantial sum of money and attorneys' fees.[4] Boswell signed a letter agreeing to the settlement, in which he promised not to reveal its financial terms unless the IBEW did so first. The district judge entered an order stating that the parties had settled on terms set forth in separate letters, and he redacted references to the financial terms of the settlement from the transcript of the settlement hearing. He did not, however, order any party not to disclose the terms of the settlement.[5]

In late 1981, Mallick wrote to the International President and International Secretary of the IBEW. He asked that he be allowed to examine IBEW books and records reflecting its expenditures in *Boswell*, including the amount of all attorneys' fees and other costs of defending the union and its officials, as well as the amounts paid to Boswell and his counsel. Mallick later explained that he believes the IBEW litigates union democracy lawsuits without regard to costs or to the best interests of members, simply to discourage members from bringing such lawsuits. The IBEW refused his request,[6] and on April 19, 1982, Mallick brought this action against the

IBEW, its International President, and its International Secretary.

In his complaint, Mallick requested injunctive and declaratory relief granting him access to the disputed IBEW books and records. According to the complaint, disclosure of the *Boswell* costs would enable IBEW members to engage in more informed debate about whether the union was wise to defend the suit as it did, and would assist IBEW members in determining whether any of the *Boswell* payments were excessive or improper.[7] On cross-motions for summary judgment, the district court granted summary judgment on all claims for the IBEW. *Mallick v. International Bhd. of Elec. Workers*, No. 82–1075 (D.D.C. Oct. 14, 1983) (order).

## II. THE SUBSECTION 201(C) CLAIM

### A

Mallick's first claim arises under subsection 201(c) of the LMRDA. The relevant passage from subsection 201(c) reads:

Every labor organization required to submit a report under this subchapter shall make available the information required to be contained in such report to all of its members, and every such labor organization and its officers shall be under a duty ... to permit such member for just cause to examine any books, records, and accounts necessary to verify such report.

---

3. Complaint at 14–16 (Aug. 24, 1979), *Boswell v. International Bhd. of Elec. Workers*, Civ. No. 79–2571 (D.N.J. Mar. 2, 1981), R. Item 13, Exhibit A.

4. *See Boswell v. International Bhd. of Elec. Workers*, Civ. No. 79–2571, judgment and consent order at 1 (D.N.J. Mar. 2, 1981); Transcript of Proceedings, *Boswell v. International Bhd. of Elec. Workers*, at 7–10, R. Item 6, Exhibit C.

5. *See Boswell v. International Bhd. of Elec. Workers*, Civ. No. 79–2571 (D.N.J. Mar. 4, 1981) (consent order sealing documents and transcript references); *Boswell v. International Bhd. of Elec. Workers*, Civ. No. 79–2571 (D.N.J. Mar. 2, 1981) (judgment and consent order); *see also* Letter from Laurence J. Cohen (IBEW counsel) to Paul Alan Levy (Mar. 23, 1982), R. Item 6, Exhibit D (acknowledging that consent order does not bar IBEW from releasing *Boswell* costs).

At the *Boswell* settlement hearing, counsel for the IBEW asked the district court to sign an order directing the payment of attorneys' fees for Boswell, because the IBEW was "concerned about the possibility of strike suits." Transcript of Proceedings, *Boswell v. International Bhd. of Elec. Workers*, at 20, R. Item 6, Exhibit C. The district court declined, "because I have no basis at all for arriving at the numbers." *Id.* at 21.

6. *See* Letters from John Mallick to Ralph A. Legion and to Charles H. Pillard (undated), R. Item 6, Exhibit I; Letter from Laurence J. Cohen to Paul Alan Levy (Feb. 26, 1982), R. Item 6, Exhibit I.

The defendants-appellees are collectively referred to as "the IBEW" in this opinion.

7. *See* Complaint at 6–7, R. Item 1. Mallick also requested attorneys' fees and costs. *Id. See also* Amended Complaint at 6–7, R. Item 9.

29 U.S.C. § 431(c). Mallick argues that subsection 201(c) grants union members a general right of access to records underlying the LM–2 reports, qualified only by the requirement that they show "just cause." Under this view, a union member need not show any troubling item at all on his union's LM–2 reports to establish a right to examine the underlying records. According to Mallick, the phrase "necessary to verify such reports" merely limits the right of examination to records of those transactions actually summarized in the LM–2. Thus, although non-financial records concerning, for example, organizing and negotiating strategy would not be available, any records of transactions reflected in items on the LM–2 report would be.

The IBEW replies that the LM–2 report it filed for 1980–1981, the reporting year in which *Boswell* was settled, was accurate and showed no items that were grossly disproportionate in amount. On its view, Mallick therefore does not seek to "verify" the report, and consequently has no right to examine the underlying records.

Mallick does not concede that he must show anything on the face of the report suggesting improprieties. But he believes that even if there is such a requirement, he has met it. Specifically, Mallick notes that the LM–2 report showed a drop of nearly $400,000 in the balance of a special reserve fund IBEW maintains for legal expenses, called the Defense Fund. From 1973 to 1980, the Fund balance did not vary by more than 1% from $5,000,000; the $400,000 change in 1980–1981 represented a decline of about 8%.[8] According to the IBEW constitution, the Fund "shall be for the sole purpose of providing legal defense. No disbursements shall be made from this fund except for the legal defense of L.U.'s [local unions] and their members, or for the defense of an International Officer or Representative ...." IBEW Const. art. XI, § 1 (1982), R. Item 8, Exhibit C at Exhibit A. Mallick argues that the sudden drop suggests an abnormally high outlay for legal expenses in that year.[9]

The IBEW has acknowledged that before Mallick brought this action, it had not disclosed to its members whether the *Boswell* costs were paid from the Defense Fund or the General Fund. The IBEW Constitution does not appear to require that all attorneys' fees for IBEW representation be paid from the Defense Fund, and does not clearly state whether settlements and attorneys' fees for adverse parties are ordinarily paid from the Fund at all.[10]

The 1980–1981 LM–2 report also stated that the IBEW had spent $2,082,887 in "Professional Fees." This item, however, includes payments for auditing, economic research, and similar services, as well as for outside legal work. It does not include compensation to employees for professional services, which is accounted for separately.[11]

---

8. *See* R. Item 6, Exhibit F; Plaintiff's Statement of Material Facts ¶ 21; Defendants' Statement of Genuine Issues ¶ 21.

9. The Defense Fund is supported by regular assessments on union members. *See* IBEW Const. art. X, §§ 1–3, 6 (1982), R. Item 8, Exhibit C at Exhibit A. Any balance in the Fund exceeding $5,000,000 may be transferred to the IBEW General Fund. *Id.* art. XI, § 3.

10. Mallick's original complaint claimed that the IBEW had not disclosed whether the *Boswell* costs were paid from the Defense Fund or the General Fund, *see* Complaint ¶ 13, R. Item 1, and the IBEW's answer admitted the allegation, Answer ¶ 13, R. Item 4. Mallick repeated the allegation in his papers requesting summary judgment. Plaintiff's Statement of Material Facts ¶ 17, R. Item 6. The IBEW then disputed the allegation, relying on an affidavit in which the IBEW International President stated that under "the historic and uniform IBEW practice," monies paid pursuant to settlements "consistently come from the Legal Defense Fund." Affidavit of Charles H. Pillard ¶ 8 at 2, R. Item 13, Exhibit C.

However, on this record we cannot say that the relevant text from the IBEW constitution, quoted *supra* in text, makes this interpretation obvious. In any event, we do not hinge our view of the LM–2 report on this ambiguity; it is simply one of the circumstances that made the report difficult to understand fully.

11. *See* U.S. Dep't of Labor, Labor Organization Annual Report: Form LM–2 and Instructions at 7 (1981) (instructions for item 63), R. Item 14 (attachment).

In deciding this case, we assume that the LM–2 report accurately set forth the required information. We note, however, that the report would leave an interested union member almost completely uninformed about basic union financial practices concerning litigation. He would have little idea of the total expenditure on legal costs, let alone how the total expenditure breaks down.[12] He could not evaluate the specific concern Mallick raises: that the IBEW defends union democracy suits like *Boswell* without regard to costs or to the interests of the members. Finally, he would be entirely unable to understand the meaning of the change in the Defense Fund balance, which might reflect anything from unusual but essentially random fluctuation to a very sharp increase in actual legal costs, possibly caused by payments in a single major litigation.

We must decide whether the LMRDA affords a union member in this position any remedy. That question involves two subsidiary inquiries. First, does the right of examination merely assist union members in forcing their unions to file accurate reports? And second, if the right of examination goes beyond this limited scope, does it extend to the facts presented here? To address these problems, we examine the statutory text in light of its legislative history.

**B**

The district court held that because Mallick had not shown that the LM–2 report

was "untruthful, inaccurate, or incomplete," District Court Op., *supra* note 2, at 3, examination of the underlying records was not necessary to verify the reports. This is a plausible reading of the statutory text, but it is certainly not the only possible interpretation. As the various theories of the parties and the rather tangled web of judicial decisions concerning subsection 201(c) make plain, its language is simply too general and ambiguous to resolve this controversy. Moreover, the Supreme Court has cautioned lower courts to be especially leery of interpreting the LMRDA based on uncertain inferences from word-by-word parsing of the statute. "We must look to the objectives Congress sought to achieve, and avoid ' "placing great emphasis upon close construction of the words." ' " *United Steelworkers v. Sadlowski,* 457 U.S. 102, 111, 102 S.Ct. 2339, 2345, 72 L.Ed.2d 707 (1982) (quoting *Wirtz v. Local 153, Glass Bottle Blowers Ass'n,* 389 U.S. 463, 468 n. 6, 88 S.Ct. 643, 646 n. 6, 19 L.Ed.2d 705 (1968) and Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 852 (1960)).

The LMRDA was enacted after lengthy congressional investigations disclosed that in many instances, union officials had run unions as private fiefdoms, in utter defiance of the interests of members. *See* Interim Report of the Select Committee on Improper Activities in the Labor or Management Field, S.Rep. No. 1417, 85th

---

**12.** Because the IBEW report does not specifically account for monies paid into the Defense Fund or monies transferred from the Defense Fund to the General Fund during the fiscal year, *see supra* note 9, the year-end balance figures would not enable a union member to calculate total legal expenditures.

The instructions for the 1980–1981 LM–2 report stated that "[i]f your organization has a 'special fund' ... be sure to include the requested information and amounts for the 'special funds' ... in all items and schedules." U.S. Dep't of Labor, Labor Organization Annual Report: Form LM–2 and Instructions at 3 (1981). We therefore assume that expenditures from the fund were separately reported in, for example, the "Professional Fees" item. We are uncertain in what separate item the settlement payment to

Boswell may be included, but because the litigants did not raise the question we do not consider it in our disposition.

Mallick also argues that the 1980–1981 LM–2 report did not show legal fees paid for the individual defense of an IBEW vice president sued in *Boswell* as an "indirect disbursement" to that officer. *See* LMRDA § 201(b)(3), 29 U.S.C. § 431(b)(3). There is good reason to question whether these payments were indirect disbursements within the meaning of the LMRDA, *cf. Urichuck v. Clark,* 689 F.2d 40, 42–44 (3d Cir. 1982) (in title I LMRDA action where union officials did not act *ultra vires,* court found no conflict of interest requiring separate representation of union and officials); *id.* at 44–45 (Weis, J., concurring), but we need not decide the issue.

Cong., 2d Sess. 4–6 (1958). Congress' response was to pass legislation that sought to end "autocratic rule by placing the ultimate power in the hands of the members, where it rightfully belongs, so that they may be ruled by their free consent, [and] may bring about a regeneration of union leadership." [13]

It carried out that basic policy through a variety of provisions, including a comprehensive "Bill of Rights of Members of Labor Organizations," which protects equal voting rights, freedom of speech and of assembly, and other basic safeguards for union democracy, see LMRDA §§ 101–105, 29 U.S.C. §§ 411–415; financial reporting requirements for unions, union officials, and employers, see LMRDA §§ 201–206, 29 U.S.C. §§ 431–436; detailed procedural requirements for the conduct of union elections, see LMRDA §§ 401–403, 29 U.S.C. §§ 481–483; and the imposition of certain fiduciary duties on union officials, see LMRDA § 501, 29 U.S.C. § 501. By ensuring that members could assert practical control over union policies, Congress attempted to prevent corruption with a minimum of direct federal intervention in union decisionmaking. [14]

Senator Goldwater offered the provision that became subsection 201(c) as an amendment from the Senate floor to the Kennedy-Ervin bill, which was one of a number of labor reform bills considered by the 86th Congress. The original text read:

Every labor organization required to submit a report under this title shall make available copies of such reports to each of its members and shall permit such members to examine the books, records, and accounts of such transactions as were or may be necessary to prepare or verify the reports required by section 101. The Secretary shall by regulation prescribe the form and manner for making such reports available to such members, and the time, place, circumstances, and conditions under which such books, records, and accounts may be examined by such members. [15]

Senator Goldwater simultaneously distributed to the Senate a memorandum explaining his amendment. The first sentence of that memorandum stated without qualification that the amendment "requires the union ... to permit the union members to examine the basic records upon which the report is based." 105 Cong.Rec. 6520 (1959), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1125.

In support of his amendment, Senator Goldwater argued that if union members could not look into the accuracy of the reports, unions might simply file false reports and gamble that the Secretary of

---

**13.** 105 Cong.Rec. 6472 (1959) (remarks of Sen. McClellan), *reprinted in* 2 National Labor Relations Board, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1099 (1959) [hereinafter cited as LMRDA Legislative History].

**14.** *See* Senate Comm. on Labor and Public Welfare, Labor-Management Reporting and Disclosure Act of 1959, S.Rep. No. 187, 86th Cong., 1st Sess. 7, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2318, 2323, *and in* 1 LMRDA Legislative History, *supra* note 13, at 397, 403; *see also* House Comm. on Labor and Education, Labor-Management Reporting and Disclosure Act of 1959, H.Rep. No. 741, 86th Cong., 1st Sess. 9, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2424, 2431, *and in* 1 LMRDA Legislative History, *supra* note 13, at 759, 767.

**15.** 105 Cong.Rec. 6520 (1959), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1125.

Senator Goldwater had previously introduced a labor reporting bill drafted by the Eisenhower administration, which would have given union members a blanket right to inspect union records underlying the reports filed with the Secretary of Labor. *See* S. 748 § 204, 86th Cong., 1st Sess., 105 Cong.Rec. 1273, 1274 (1959), *reprinted in* 1 LMRDA Legislative History, *supra* note 13, at 84, 98–99. The chief rival to that bill in the Senate was the Kennedy-Ervin bill, which granted union members access to the required reports, but did not permit them to inspect the underlying records. *See* S. 505 § 201, 86th Cong., 1st Sess., 105 Cong.Rec. 888, 889 (1959), *reprinted in* 1 LMRDA Legislative History, *supra* note 13, at 29, 35. The bill that emerged from the Senate Committee on Labor and Public Welfare followed the Kennedy-Ervin bill on this point. *See* 155 § 201, 86th Cong., 1st Sess., 105 Cong.Rec. 5975 (1959), *reprinted in* 1 LMRDA Legislative History, *supra* note 13, § 332, 345. Senator Goldwater then offered his amendment to the bill as reported.

Labor, with limited resources to check on many thousands of reports, would not investigate.[16] Nonetheless, neither he nor the other Senators present suggested that the amendment limited the right of examination to situations in which the reports appeared to be false. Senator John Kennedy objected that the amendment "would give the right to every union member to examine in detail the records, books, financial statements, checkbooks, and all the details of the union's operations, when the member willed it." 105 Cong.Rec. 6520 (1959), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1126. Senator Goldwater replied, "[u]nder circumstances to be prescribed by the Secretary of Labor." *Id.* He added that "I should like to make it possible for a union member who believes something is wrong with the bookkeeping, *or that something is wrong with the operations of the union,* to have access to the books." *Id.* (emphasis added). He thus agreed with Senator Kennedy that the amendment granted examination at the will of the member, adding only that the Secretary of Labor could limit exercise of the right to reasonable times and places.

Senator Goldwater responded to concern that his amendment could be used as a tool for harassing unions or passing their confidential information to management by offering a modified version of the amendment. That version read:

Every labor organization required to submit a report under this title shall make available copies of such reports to each of its members and shall permit such members *for proper cause* to examine the books, records, and accounts of such transactions as were or may be necessary to prepare or verify the reports required by section 101. The Secretary shall by regulation prescribe the *cause,* form, and manner for making such reports available to such members, and the time, place, circumstances, and conditions under which such books, records, and accounts may be examined by such members.

*Id.* at 6522 (emphasis added to indicate changed passages), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1127–28.[17] Immediately before the amendment was adopted, Senator Javits, who prepared the compromise amendment with Senators Goldwater and Kennedy, stated:

I think this is an excellent solution of the matter, because it equates the rights of the union members with the rights of corporate stockholders, and it prevents a proliferation of the inspection. I believe the amendment is acceptable, because it would prevent vexatious forays into the unions' books.

*Id.* at 6523, *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1128.[18]

---

16. *See* 105 Cong.Rec. 6520 (1959) (memorandum of Sen. Goldwater), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1125; *id.* (remarks of Sen. Goldwater); *cf.* Senate Comm. on Labor and Public Welfare, Labor-Management Reporting and Disclosure Act of 1959, S.Rep. No. 187, 86th Cong., 1st Sess. 96–97 (minority views) (criticizing Kennedy-Ervin bill for failing to provide means of checking accuracy of union reports), *reprinted in* 1959 U.S.Code Cong. & Ad.News 2318, 2400–01, *and in* 1 LMRDA Legislative History, *supra* note 13, at 397, 492–93.

Senator Goldwater argued that if members were denied access to union records, they would have no way at all to decide if the reports were believable. *See* 105 Cong.Rec. 6520 (1959); *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1125. That argument appears inconsistent with the idea that *before* access is allowed, a union member must show that the reports are suspicious.

17. The word "cause" is apparently misplaced in the last sentence of the amendment, since all versions of the bill gave union members an absolute right of access to union reports. The word evidently should have been added before "time, place, circumstances, and conditions." So interpreted, the modified amendment would have permitted the Secretary of Labor to issue regulations elaborating the "proper cause" requirement.

18. The legislative history contains other comparisons between the right of shareholders to examine corporate records and the rights of union members under § 201(c). *See* 105 Cong. Rec. 6520 (1959) (remarks of Sen. Goldwater) ("Should not a union member ... be given at least the same right as a stockholder of a corporation?"), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1125; *id.* at 6521 (colloquy between Sen. Allott and Sen. Kennedy),

In short, both the language of the Senate provision and the debate preceding its adoption indicate that the provision would have given union members a general right to examine union records underlying the LM–2 reports, provided that the members showed proper cause. The Senate relied on the "proper cause" requirement to prevent harassment of unions, and not on any notion that examination was available only if the LM–2 reports were suspicious.

Representatives Landrum and Griffin subsequently introduced two identical bills in the House of Representatives. The Landrum-Griffin bill required unions to make their financial reports available to members, and "to permit such member for just cause to examine any books, records, and accounts necessary to verify such report." H.R. 8400 § 201(c), 86th Cong., 1st

Sess., *reprinted in* 1 LMRDA Legislative History, *supra* note 13, at 619, 636.[19] The bill as reported by the House Committee on Education and Labor and as passed by the House retained this language. The conference report adopted the House version of subsection 201(c), *see* Comm. on Conference, Labor-Management Reporting and Disclosure Act of 1959, H.R.Rep. No. 1147, 86th Cong., 1st Sess. 31–32, *reprinted in* 1 LMRDA Legislative History, *supra* note 13, at 935–36, and that version was the one ultimately enacted, *see* LMRDA, Pub.L. No. 86–257, § 201(c), 73 Stat. 519, 525 (1959).[20]

The legislative history in the House does not explain the significance of the differences between its version of subsection 201(c) and the version in the bill passed by the Senate.[21] The House report does, how-

---

*reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1126.

At the time the LMRDA was passed, as now, "proper purpose" was a term of art used generally in describing the reasons for which a shareholder could inspect corporate records. *See, e.g., Estate of Bishop v. Antilles Enters., Inc.,* 252 F.2d 498, 500 & n. 3 (3d Cir.1958); *Crouse v. Rogers Park Apartments, Inc.,* 343 Ill.App. 319, 322, 99 N.E.2d 404, 405–06 (1951). *See generally* Bartels & Flanagan, Inspection of Corporate Books and Records by Stockholders and Directors, 38 Cornell L.Q. 289 (1953); Note, Inspection of Corporate Books and Records in Delaware, 41 Va.L.Rev. 237 (1955). The common-law interpretation of the term varied in different states, and a number of states had statutes that either supplemented or superseded the common-law right. *See* Bartels & Flanagan, *supra,* at 297–305. The general rule, however, was that a shareholder was not required to produce evidence of any actual mismanagement, *see, e.g., Doggett v. North Am. Life Ins. Co.,* 396 Ill. 354, 358–59, 71 N.E.2d 686, 688 (1947); *Durr v. Paragon Trading Corp.,* 270 N.Y. 464, 468–71, 1 N.E.2d 967, 969–70 (1936); Bartels & Flanagan, *supra,* at 303–04, let alone evidence of illegal corporate conduct or breach of fiduciary duty.

**19.** We note that the verbs "prepare *or* verify" in the original Senate version were in the disjunctive. Thus, once a union member had shown that records were used to prepare the reports filed with the Secretary of Labor, the "prepare or verify" clause would have been fully satisfied, without inquiry into the meaning of the word "verify." The view that a union member can gain access to records only if he actually

seeks to "verify" the accuracy of the reports must therefore rely solely on the different wording adopted without explanation by the House and accepted by the Senate.

**20.** The bill reported by the House Committee on Education and Labor was a compromise bill that combined provisions of several labor reform bills referred to the committee. Subsection 201(c) in the reported bill was identical to § 201(c) of the Landrum-Griffin bill as referred to committee. *Compare* H.R. 8342 § 201(c), 86th Cong., 1st Sess. (1959) (House committee bill), *reprinted in* 1 LMRDA Legislative History, *supra* note 13, at 687, 705–06 *with* H.R. 8400 § 201(c), 86th Cong., 1st Sess. (1959) (Landrum-Griffin bill as referred), *reprinted in* 1 LMRDA Legislative History, *supra* note 13, at 619, 636. The Committee of the Whole House on the State of the Union substituted the entire text of the Landrum-Griffin bill as amended, which still contained the same § 201(c), for the House committee bill. *See* 105 Cong.Rec. 15,702, 15,705 (1959) (text of Landrum-Griffin bill, offered as Landrum amendment to House committee bill); *id.* at 15,859–60 (adoption of Landrum amendment, with further amendments not affecting § 201(c)), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1691–92. The House then passed the Landrum-Griffin bill. *See* H.R. 8342 § 201(c), 86th Cong., 1st Sess., 105 Cong.Rec. 15,883, 15,885 (1959) (bill as passed by House); 105 Cong.Rec. 15,891–92 (1959) (recording passage), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1701–02.

**21.** The specific references in the House report and conference report to the right of inspection

ever, set forth general principles relevant to the interpretation of the subsection:

> The members of a labor organization are the real owners of the money and property of such organizations and are entitled to a full accounting of all transactions involving such money and property. Because union funds belong to the members they should be expended only in furtherance of their common interest. A union treasury should not be managed as though it were the private property of the union officers, however well intentioned such officers might be, but as a fund governed by fiduciary standards.
>
> .... [I]f unions are to enjoy the protection of rights and exercise the broad powers which are guaranteed to them by the National Labor Relations Act and the Railway Labor Act, they ought also to be held responsible for abuses that have accompanied the exercise of such powers and rights by some union leaders.
>
> Similarly the rules governing the conduct of the union's business, such as dues and assessments payable by members, membership rights, disciplinary procedures, election of officers, provisions governing the calling of regular and special meetings—all should be known to the members. Without such information freely available it is impossible that labor organizations can be truly responsive to their members.

It is the purpose of this bill to insure that full information concerning the financial and internal administrative practices and procedures of labor organizations shall be, in the first instance available to the members of such organizations. In addition, this information is to be made available to the Government, and through the Secretary of Labor, is to be open to inspection by the general public. By such disclosure, and by relying on voluntary action by members of labor organizations, it is hoped that a deterrent to abuses will be established.

House Comm. on Education and Labor, Labor-Management Reporting and Disclosure Act of 1959, H.R.Rep. No. 741, 86th Cong., 1st Sess. 7–8, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2424, 2430, *and in* 1 LMRDA Legislative History, *supra* note 13, at 759, 765–66.

This passage principally refers to section 501 of the LMRDA, 29 U.S.C. § 501, which creates a fiduciary relationship between union officials and union members. We deal with Mallick's claim under that section below, but the House committee's emphasis on the broad duty of disclosure owed to union members by their officers is surely relevant in interpreting subsection 201(c) as well. In our view, it would be strange if subsection 201(c)—a provision evincing special concern with the disclosure of financial information—were read as narrowly limiting the general fiduciary principles that

did little more than track the statutory language. *See* House Comm. on Education and Labor, Labor-Management Reporting and Disclosure Act of 1959, H.R.Rep. No. 741, 86th Cong., 1st Sess. 32, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2424, 2455, *and in* 1 LMRDA Legislative History, *supra* note 13, at 759, 790; Comm. of Conference, Labor-Management Reporting and Disclosure Act of 1959, H.R.Rep. No. 1147, 86th Cong., 1st Sess. 31–32, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2503, 2504, *and in* 1 LMRDA Legislative History, *supra* note 13, at 934, 935–36; *see also* Staff of Senate Subcomm. on Labor of the Comm. on Labor and Public Welfare, Section-by-Section Analysis of the Labor-Management Reporting and Disclosure Act of 1959, at 5 (Comm.Print), *reprinted in* 1 LMRDA Legislative History, *supra* note 13, at 947, 951; *cf.* 105 Cong.Rec. 15,548 (1959) (remarks of Rep. Bolling, inserting statement writ-

ten by Rep. Elliott describing House committee bill) ("[In § 201(c)] Uncle Sam was perhaps reaching his hand rather heavily into the internal affairs of unions, but the committee felt that this section provided a chance for union members to do a considerable job of policing their own unions, where necessary ...."), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1584; 105 Cong.Rec. A6572 (daily ed. July 29, 1959) (extension of remarks of Rep. Brademas) (§ 201(c) creates right of examination "for purposes of verification"), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1773; 105 Cong.Rec. 19,759 (1959) (extension of remarks of Sen. Goldwater) (House approved right of inspection "substantially" in form originally passed by Senate), *reprinted in* 2 LMRDA Legislative History, *supra* note 13, at 1845. None of these scraps of legislative history seems very compelling on the point at issue.

govern other aspects of the financial relationship between union officials and union members.

Moreover, the legislative history of the "just cause" requirement of subsection 201(c) clearly shows that the Senate intended to encourage judicial borrowing of disclosure standards from a related area of the law: the rules governing a shareholder's right to examine corporate books. The Senate thus embedded in subsection 201(c) itself a plain reference to the same fiduciary responsibility in financial matters it created in section 501(a). The House legislative history vigorously reemphasized the idea that these principles define the financial responsibility of union officials. We are therefore reluctant to say that the House's exclusion of records necessary to "prepare" the reports from examination, coupled with its change of "proper" to "just" cause, entirely removed the original stress on fiduciary responsibility from subsection 201(c), and substituted a narrow means of policing accuracy in union filings.[22]

However, we need not decide whether the "necessary to verify" language of subsection 201(c) simply defines the records subject to examination, or imposes a requirement that the union member actually seek to verify the LM–2 reports. We hold only that when a union member points to a sudden, apparently significant, and unexplained change in an item on his union's LM–2 report, he has satisfied any connection that subsection 201(c) may require between the report and the underlying records.

In our view, this result is more consistent with the policies of the LMRDA than a theory that reduces the right of examination to a check on the union's arithmetic. Typically, union members will be interested in looking at underlying records precisely because they believe the LM–2 reports *are* accurate, and raise questions about the handling of union funds. Nor do we believe that subsection 201(c) requires that union members allege an actual breach of fiduciary duty in the handling of funds or any other wrongdoing. Permitting a union member to inspect union records is not a method of punishing a union or its officials; it is simply a method of ensuring that union members are sufficiently well informed to participate intelligently in union affairs. At least when the union's LM–2 reports show abrupt and unexplained shifts, a union may not simply dig in its heels and refuse to explain what the change means.

Cases dealing with the "necessary to verify" provision of subsection 201(c) have generally rejected a cramped literalism. In *Rekant v. Rabinowitz*, 194 F.Supp. 194 (E.D.Pa.1961), for example, the union member complained

> that the report does not disclose the purpose of the "disbursements to officers" or of the "other disbursements" [items in the filed reports], that the item of "office and administrative expense" is too high because the union has only 23 members

---

**22.** The exclusion of records necessary to "prepare" the reports might reflect a decision to make confidential working papers and similar documents unavailable. *Cf.* LMRDA § 204, 29 U.S.C. § 434 (exempting attorney-client communications from any reporting duty of attorney). At the time the LMRDA was passed, it was unclear in many states whether shareholders could inspect confidential corporate documents that did not reflect completed corporate transactions. *See, e.g., News-Journal Corp. v. State ex rel. Gore,* 136 Fla. 620, 624, 187 So. 271, 272 (1939) ("trade secrets and confidential communications" unavailable "unless they affect the financial status or the value of [the shareholder's] stock"); *Electro-Formation, Inc. v. Ergon Research Labs., Inc.,* 284 Mass. 392, 395, 187 N.E. 827, 828 (1933) ("secret researches" una-

vailable); *State ex rel. Jones v. Ralston Purina Co.,* 358 S.W.2d 772 (Mo.1962) (tentative financial documents unavailable under state statute) (reviewing cases). Controversy on the point has continued. *See In re LTV Sec. Litigation,* 89 F.R.D. 595, 609–11 (N.D.Tex.1981) (minutes of meeting between directors and counsel unavailable; *Riser v. Genuine Parts Co.,* 150 Ga. App. 502, 504–05, 258 S.E.2d 184, 186–87 (1979) (confidential work sheets and legal opinions generally unavailable); *Master Mortgage Corp. v. Craven,* 127 Ga.App. 367, 371–72, 193 S.E.2d 567, 570 (1972) (income tax worksheets unavailable); *Meyer v. Ford Indus., Inc.,* 272 Or. 531, 533–43, 538 P.2d 353, 354–58 (1975) (preliminary financial statement and commentary available).

and no office, that none of these items was ever discussed at union meetings, reported to or voted upon by the members of the union, and that despite his demand on the union to look at its books and records, he has not been permitted to do so.

*Id.* at 195. The plaintiff apparently did not allege that the union illegally failed to include the additional information he sought in the LM–2 reports, nor was there "a specific averment that the statements in the report are not true." *Id.* Nonetheless, the district court held that "with a wider construction [the word 'verify'] also can mean to check generally on the accuracy or completeness of a statement or statements. Under the broader definition plaintiff's averments are sufficient . . . ." *Id.*

A number of other cases deal with the connection between the LM–2 reports and the records sought as an aspect of just cause. In *Fruit & Vegetable Packers and Warehousemen Local 760 v. Morley,* 378 F.2d 738 (9th Cir.1967), for example, the court described "just cause" in the following way:

The standard for determining whether there was just cause is necessarily minimal. Just cause need not be shown beyond a reasonable doubt, nor by a preponderance of the evidence. It need not be enough to convince a reasonable man that some wrong has been done; it is enough if a reasonable union member would be put to further inquiry. Perhaps it will be that a certain item is disproportionately high . . . or that an officer contends that he did not incur the claimed expenses . . . . Irrespective of the nature of the asserted cause, the test must be whether reason would require substantiation.

*Id.* at 744 (citations omitted).[23]

In *Cumbea v. Local 400, Aluminum Workers' International Union,* 460

F.Supp. 60 (E.D.Va.1978), the union member noted "that despite regular dues increases a reserve fund denominated a 'strike fund' recently had been transferred into the general fund of the union. This admitted fact put plaintiff on inquiry as to why the transfer of a reserve fund to the general fund had become necessary." *Id.* at 61. The *Cumbea* court rejected the union's argument that because the member alleged no breach of fiduciary duty, he had not shown just cause. *Id.* at 62. Instead, the court suggested that a member who simply wanted further information about an unusual transaction reflected on the LM–2 report satisfied *Morley. Id.* On the other hand, in *Flaherty v. Warehousemen, Garage & Service Station Employees' Local Union No. 334,* 574 F.2d 484 (9th Cir. 1978) (per curiam), the court rejected a union member's comprehensive request for a complete accounting of all union records. The court commented that the union member "never has contended that he desired to examine [the union's] books in order to verify its LM–2 reports and never raised any question concerning those reports. . . . While access to union records might indeed result in more intelligent voting . . . that is not the purpose of section [201(c)]. . . ." *Id.* at 486. The court also stated that "the purpose for the inquiry into the union's records must be to examine the basis for the union's financial report." *Id.*

*Flaherty* concerned a blanket request for examination of union financial records, with no reason offered except political opposition to union officials. The *Flaherty* per curiam opinion explicitly relied on *Morley,* which recognized that the reporting and disclosure provisions of the LMRDA were enacted so that union members could exercise informed control over union affairs. *See Flaherty,* 574 F.2d at 486 (citing

**23.** The word "substantiation" in the quoted passage is somewhat ambiguous, and may partly account for the varying interpretations later courts have given to *Morley.* The *Morley* court commented in a footnote that the high reimbursed expenses of a union official might be enough to establish just cause, 378 F.2d at 744 n.

2, although there was no suggestion that the figure was false. In light of the *Morley* court's view that the LMRDA reflects strong congressional support for broad disclosure, *see id.* at 742–43, we do not read "substantiation" as requiring any doubt about the accuracy of the report.

*Morley,* 378 F.2d at 744). In our view, *Flaherty* is basically consistent with that purpose: it simply determined that political opposition to union officials, unaccompanied by any specific concern with transactions summarized on the LM–2 report, does not constitute just cause for rummaging through all the union records.[24]

The language of these decisions, and that of others interpreting subsection 201(c),[25] does not always fall into a neat pattern. But their rejection of the theory that a subsection 201(c) claimant must show outright error or grossly suspicious items on the LM–2 report is clear enough. They thus support our view that at least when a union member demonstrates a sudden, apparently significant, and unexplained change in an LM–2 item, he has satisfied any connection the "necessary to verify" provision may require between the LM–2 report and the underlying records.

Mallick has clearly satisfied this principle. As we note above, the 8% change in the balance of the Defense Fund was far greater than changes in preceding years, and the significance of the change was entirely unclear. Litigation expenses were reported in such broadly inclusive and vaguely defined categories that union members could not have intelligently deter-mined what meaning, if any, this abrupt change had. The IBEW argues that this change might reflect expenditures unconnected with *Boswell,* and that the *Boswell* figures alone could not "verify" the Defense Fund balance. But where a union member has some notion of what may account for a changed item and therefore does not ask for all the records underlying that item, we think it would be hypertechnical to deny examination on the ground that the member asked to see too few records.

C

The IBEW argues that even if Mallick is otherwise entitled to inspect the records reflecting the *Boswell* costs, disclosure of the settlement terms would seriously damage the union's interests. Specifically, the union claims that disclosure would encourage nuisance suits against the IBEW, and would establish a target amount at which subsequent litigants against the IBEW will aim. We think that whether these concerns are enough to defeat Mallick's request for examination should be addressed in the first instance by the district court in deciding whether "just cause" for examination exists.[26] However, we add a few words for its guidance.

24. As we discuss above, Mallick has expressed specific concern over an item in the LM–2 report. *See supra,* at 775–776. *Flaherty* therefore does not govern this case. We consequently have no occasion to consider the *Flaherty* holding as it might restrict the application of § 201(c) in other settings.

25. *See Gabauer v. Woodcock,* 594 F.2d 662, 665 (8th Cir.) (en banc), *cert. denied,* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *Landry v. Sabine Indep. Seamen's Ass'n,* 623 F.2d 347, 349 (5th Cir.1980); *Thompson v. Union of Flight Attendants,* 109 L.R.R.M. 2870, 2873–75 (C.D. Cal.1982); *Zaloga v. Ruggiero,* 529 F.Supp. 443 (E.D.N.Y.1982); *Coratella v. Roberto,* 56 L.R. R.M. 2668 (D.C.Conn.1964); *McCraw v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Indus.,* 216 F.Supp. 655, 663 (E.D.Tenn.1963), *aff'd on other grounds,* 341 F.2d 705 (6th Cir.1965); *Allen v. Bridge Structural & Ornamental Iron Workers, Local 92,* 47 L.R.R.M. 2214 (N.D.Ala.1960).

26. The IBEW urges us to decide this issue, relying in part on *Federal Deposit Ins. Corp. v. Ernst & Ernst,* 92 F.R.D. 468 (E.D.N.Y.1981), *aff'd,* 677 F.2d 230, 232 (2d Cir.1982). We think the facts of *Ernst & Ernst* are quite remote from those of this case.

In *Ernst & Ernst,* a consumer sought disclosure of the financial terms of a settlement in a highly publicized lawsuit between the FDIC and numerous defendants connected with the insolvency of the Franklin National Bank. Because disclosure of the settlement terms would have affected pending legal disputes, the parties agreed that the FDIC would not disclose the terms unless the defendants did so first. *Id.* at 469–70. The consumer group, which intervened two years after the settlement, argued that a court could order a federal agency to withhold agency records only if the records were exempt from disclosure under the Freedom of Information Act. The court rejected the argument and refused to modify its order. *Id.* at 470–71.

*Ernst & Ernst* involved an action against a party actually bound by a bona fide confidentiality agreement, approved by the court only after consideration of the public interest in disclosure. *Id.* In this case, the IBEW exacted a

As we have already suggested, we believe that "just cause" calls for application of fiduciary principles,[27] adapted to recognize the special characteristics of unions.[28] The burden of proof in demonstrating just cause is on the union member, *Gabauer v. Woodcock*, 594 F.2d 662, 665 (8th Cir.) (en banc), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979), and he may not inquire into union records out of idle curiosity.[29] But when, as here, a union member makes the showing that we have assumed is required by the "necessary to verify" provision, he has gone a very long way to proving just cause.[30] There is presumably good reason to inquire into dis-

quieting financial changes of the kind we have identified.

Nonetheless, other principles may limit the right of examination. Hostility to the policies of union officials is not, however, one of these limitations. Traditionally, a shareholder's opposition to corporate management was not an improper purpose for examining corporate records.[31] The pervasive support for union democracy that undergirds the LMRDA leads us to reach a parallel result here: an otherwise sufficient showing under subsection 201(c) cannot be attacked because the union member opposes union policies.[32]

---

promise of confidentiality from Boswell, but the union is not bound by any such obligation. *See supra* note 5. Furthermore, the specific interests of union members in disclosure were not presented to the *Boswell* court. Finally, *Ernst & Ernst* turned partly on a finding that the Freedom of Information Act restricts administrative rather than judicial discretion to deny public disclosure of documents, *see* 92 F.R.D. at 471, but very different statutory policies are at work in this case.

**27.** *Cf. Conley v. United Steelworkers, Local Union No. 1014*, 549 F.2d 1122, 1124–25 (7th Cir. 1977) (holding that union members may copy records examined under § 201(c), based in part on analogous right of shareholders); *Local No. 1419, ILA v. Smith*, 301 F.2d 791, 796 (5th Cir. 1962) (holding that union members may employ auditor to assist in examination, based on analogous right of shareholders).

Among the cases on which *Morley* relied was *Deacon v. International Union of Operating Eng'rs, Local No. 12*, 236 Cal.App.2d 302, 46 Cal.Rptr. 11 (Cal.Dist.Ct.App.1965), *appeal dismissed and cert. denied*, 383 U.S. 103, 86 S.Ct. 717, 15 L.Ed.2d 616 (1966). *See Morley*, 378 F.2d at 744 (citing *Deacon*). *Deacon* held that an earlier California case declaring that union members had a common-law right to examine the books of their union for proper cause, *Mooney v. Bartenders Union Local No. 284*, 48 Cal.2d 841, 313 P.2d 857 (1957), also stated the test for determining "just cause" under § 201(c). *Deacon*, 236 Cal.App.2d at 306–08, 46 Cal.Rptr. at 14–15. *Mooney*, in turn, was based on an analogy between the rights of union members and statutory rights of shareholders under state corporation law. *See* 48 Cal.2d at 843, 313 P.2d at 858.

**28.** Section 501(a) of the LMRDA expressly states that the fiduciary duties of union officers must be assessed "taking into account the special

problems and functions of a labor organization," 29 U.S.C. § 501(a), and we think this principle applies with equal force to the interpretation of § 201(c).

**29.** A parallel restriction is universally enforced against shareholders seeking inspection. *See, e.g., Guthrie v. Harkness*, 199 U.S. 148, 156, 26 S.Ct. 4, 6, 50 L.Ed. 130 (1905) (dictum); *Crouse v. Rogers Park Apartments, Inc.*, 343 Ill.App. 319, 322, 99 N.E.2d 404, 405–06 (1951); 5 Smith, Fletcher Cyclopedia of the Law of Private Corporation § 2226.1 (perm. ed. 1976 & Supp.1983).

**30.** Many § 201(c) cases discuss inadequacies in a union's LM-2 reports only in considering the just cause question, rather than any verification requirement. *See, e.g., Morley*, 378 F.2d at 744; *Cumbea*, 460 F.Supp. at 61–62.

**31.** *See, e.g., Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 212–13 (Del.Ch.1976) (shareholder seeking ouster of management found to have proper purpose); *Crane Co. v. Anaconda Co.*, 39 N.Y.2d 14, 346 N.E.2d 507, 382 N.Y.S.2d 707 (1976) (tender offeror opposed by management may inspect stock book); *Celina Mut. Ins. Co. v. American Druggists Ins. Co.*, 52 Ohio App.2d 304, 307–10, 369 N.E.2d 1066, 1069–71 (1977) (interest in acquiring corporation not improper purpose).

**32.** *Cf. Zaloga v. Ruggiero*, 529 F.Supp. 443, 444 (E.D.N.Y.1982) (preliminary injunction to inspect union records granted in light of pending union election); *Cumbea v. Local 400, Aluminum Workers' Int'l Union*, 460 F.Supp. 60, 62 (E.D.Va.1978) (political opposition of dissident members to union leadership contributed to finding of just cause). *But cf. Flaherty v. Warehousemen, Garage & Service Station Employees' Local Union No. 334*, 574 F.2d 484, 486 (9th Cir.1978) (per curiam).

The threat of actual damage to the financial interests of the union involves different considerations. A shareholder often cannot obtain highly confidential information, particularly when he is likely to release the information publicly.[33] Mallick intends to disclose the *Boswell* costs to the union membership, which means public disclosure.

On these facts, the question of just cause requires balancing the IBEW's financial interest in nondisclosure against the injury to the interest of Mallick and other union members in determining how funds held in trust for them are being spent. In our opinion, this question cannot be answered by broad generalizations about the desirability of encouraging confidential settlements, although that general policy will be part of the backdrop. Nor should the district court look into the wisdom of current union policies or those advocated by Mallick: the LMRDA leaves those controversies to the union and its membership. Instead, the district court must decide whether the genuine harm to the IBEW, pragmatically viewed, outweighs the strong policy favoring access for union members who have otherwise satisfied the statutory requirements for examination.[34] Since "[t]he just cause requirement must be read in a narrow sense when invoked to resist an examination which is admittedly not for harassment," *Morley*, 378 F.2d at 738, the harm to the union must be significant. If the IBEW demonstrates that disclosure of this information would be comparable to, for example, a corporation's disclosure of trade secrets, confidential earnings projections, or the like, or a union's disclosure of organizing strategy, negotiating plans, or other secrets, then examination should be refused. If, however, the IBEW's fears

prove speculative and remote, Mallick's request should be granted.

### III. THE SUBSECTIONS 501(A) AND 101(A) CLAIMS

Mallick also argues that the IBEW has a fiduciary duty under subsection 501(a) of the LMRDA, 29 U.S.C. § 501(a), to permit him to inspect union records reflecting the *Boswell* costs. In support of that view, he cites three cases in which courts have relied on subsection 501(a) to require disclosure of information relevant to a scheduled vote of the membership. *See Petrazzulo v. Lowen*, 534 F.Supp. 173, 177 (S.D.N.Y. 1982); *Blanchard v. Lowenstein*, 388 F.Supp. 208, 215 (N.D.Ohio 1974), *aff'd in part and rev'd in part on other grounds*, 532 F.2d 1074 (6th Cir.), *cert. denied*, 429 U.S. 869, 97 S.Ct. 180, 50 L.Ed.2d 149 (1976); *Cefalo v. Moffett*, 333 F.Supp. 1283, 1283, 1288 (D.D.C.), *modified on other grounds*, 449 F.2d 1193 (D.C.Cir.1971). The IBEW replies that *Gabauer v. Woodcock*, 594 F.2d 662 (8th Cir.) (en banc), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979), rejected the use of section 501 as a general device for examination of union records. At least where no relevant union election is scheduled and the union member has not alleged an actual breach of fiduciary trust in the handling of union funds, the IBEW argues that to imply a right of examination under subsection 501(a) would defeat the limited right Congress specifically created in subsection 201(c). *Cf. Quinn v. DiGiulian*, 739 F.2d 637, 653 n. 30 (D.C.Cir.1984) (expressing doubt that § 501 forbids unions to violate political rights of members enumerated in § 101, since § 101 directly protects those rights).

However, we need not decide under what circumstances section 501 might enable a union member to examine records unavaila-

---

33. *See* 5 Smith, Fletcher Cyclopedia of the Law of Private Corporations § 2239.1 (perm. ed.1976 & 1984 Supp.); *see also supra* note 21.

34. *Cf. Garner v. Wolfinbarger*, 430 F.2d 1093, 1100–04 (5th Cir.1970) (listing factual inquiries relevant to "balancing of interests" in determining whether shareholder may inspect attorney-

corporation correspondence), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); *State ex rel. Armour & Co. v. Gulf Sulphur Corp.*, 231 A.2d 470, 473–74 (Del.1967) (weighing specific factors for and against disclosure of confidential business information to shareholder).

ble under subsection 201(c).[35] We have interpreted subsection 201(c), as applied to the facts of this case, to require consideration of essentially the same principles of fiduciary duty that govern section 501. We therefore hold that in this case, Mallick could have no right under section 501 broader than his right under subsection 201(c). For that reason, we vacate summary judgment on the subsection 501(a) claim and direct the district court to address the subsection 201(c) claim first on remand. If the subsection 201(c) claim succeeds, no further consideration of the subsection 501(a) claim will be necessary. If it fails for lack of just cause, Mallick could have no right to relief under the parallel principles governing subsection 501(a), assuming *arguendo* that subsection 501(a) applies to this case.[36]

■ Finally, Mallick brings two related claims under subsection 101(a) of the LMRDA, 29 U.S.C. § 411(a). The gist of the claims is that the union has violated his statutory rights to an equal vote and freedom of speech by failing to disclose information essential to informed participation in union politics. Subsection 101(a)(1) "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." *Calhoon v. Harvey*, 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964). This circuit has refused to take an unreasonably narrow view of the right to an equal vote, *see Bunz v. Moving Picture Machine Operators' Protective Union Local 224*, 567 F.2d 1117 (D.C.Cir.1977), but Mallick's claim is outside even a very broad view of the statute. Mallick calls attention to *Daniels v. National Post Office Mail Handlers*, 454 F.Supp. 336 (E.D.Va.1978), in which the court held that "when a union deliberately and as a matter of policy keeps its members in ignorance as to even the basic validity of the union's Constitution," *id.* at 339, the union had violated its members' voting and speech rights under subsection 101(a) by refusing to disclose this essential information. We need not consider whether *Daniels* was correctly decided, since the connection between the information sought and the union member's statutory rights under subsection 101(a) is far more attenuated in this case than it was in *Daniels*.

Mallick also relies on *Lodge 1380 Brotherhood of Railway, Airline, & Steamship Clerks v. Dennis*, 625 F.2d 819 (9th Cir.1980), in which a union member sought a list of the membership as essential to communicate his views to them, and so to exercise his right of free speech. The court held his complaint adequate to survive a motion to dismiss. *See id.* at 827–28. Again, we need not determine whether *Dennis* was correct to conclude that Mallick's claim is at a much greater remove from the statutory right to freedom of speech. That right simply does not guarantee access to all information a member might want to speak about. *Cf. United Steelworkers v. Sadlowski*, 457 U.S. 102, 111 (1982) (scope of § 101(a)(2) narrower than that of first amendment). Mallick must be able to ground his claims on a violation of a specific right enumerated in subsection 101(a), *see Bunz v. Moving Picture Machine Operators' Protective Union Local 224*, 567 F.2d at 1120, and this he has failed to do. Accordingly, we affirm summary judgment against him on the subsection 101(a) claims.

CONCLUSION

Because we believe that Mallick has sufficiently connected the IBEW's LM–2 re-

---

**35.** Thus we do not address the existence or scope of any disclosure right a union member might have under § 501 when the records sought do not underlie the union's LM–2 report, or when any "verification" requirement § 201(c) may impose, *see supra* at 781, is not met.

**36.** The parties also disagree about whether Mallick has satisfied the procedural requisites for bringing a § 501 suit, *see* LMRDA § 501(b), 29 U.S.C. § 501(b) (leave of court on verified application for good cause required); *Quinn v. DiGiulian*, 739 F.2d 637, 652 n. 28 (D.C.Cir.1984) (collecting cases interpreting requirement), but for the reasons stated in text, we leave this issue unresolved as well.

ports and the records he seeks to examine, we vacate the district court's grant of summary judgment on Mallick's subsection 201(c) claim and remand for further proceedings to determine whether Mallick can show "just cause." Mallick could obtain no relief on the facts of this action under subsection 501(a) that is not also available under subsection 201(c), and we therefore vacate summary judgment for the IBEW on the subsection 501(a) claim and direct the district court to decide this case based on subsection 201(c). We affirm summary judgment for the IBEW on the subsection 101(a) claims.

*Affirmed in part, vacated in part, and remanded.*

MacKINNON, Senior Circuit Judge, concurring.

I concur in the opinion of Judge Wald and have some additional observations.

At oral argument we requested the Union to file with the clerk its *complete* Form LM–2 as allegedly filed under the Labor-Management Reporting and Disclosure Act of 1959. This was done and in item 63 it discloses "Professional Fees $2,082,887." This figure first surfaced in this case during oral argument in response to a question from the bench. Before that disclosure the court never knew that we were not considering merely a figure of around $400,000 which had been determined by the plaintiff by noting the reduction in the "reserve for defense fund" during the Fiscal Year July 1, 1980 to June 30, 1981. Up to the disclosure of the $2 million figure, so far as would appear from the material that was in the record before the court, the only other item in the LM–2 report that would exclude expenses in connection with litigation, including the Boswell case, would be schedule 14, "Other Disbursements," for which a "schedule attached" *notation* appeared in the filed material the court had. But there was no "schedule attached" to the record filed with this court.

We have now been given what appears to be the complete Form LM–2 as allegedly filed with the Department of Labor. We do not know whether this complete report had earlier been given to Mallick in response to this request of the Union as it was required to do. If the Union only gave him the few pages from the LM–2 report that we found in the record in this court, the Union's response to Mallick's request as a union member was insufficient. For such possible insufficiency, if it existed, the Union would be subject to the court granting a motion for summary judgment.

This brings us to the complete LM–2 report as we now have it, and to the "just cause" requirement of the statute which must be shown for a union member to be able to investigate the Union books.

Item 63 shows "Professional *Fees* $2,082,887." It is noted that this figure purports to be all paid for *"fees."* That designation "fees" would not be sufficient to cover any sum paid as damages, or in lieu of damages, by the Union for its tortious conduct or specifically on behalf of its officers for their tortious treatment of Boswell.

However, assuming that some sum was paid to Boswell *as damages* for the officers' individual breach of their duties, or for the Union's breach of its duties, that item of "damages" is not indicated as being shown in item 63, which is restricted to "professional fees"—it still might be shown elsewhere in the report. The only other place that I can find it might be disclosed is schedule 14—"Other Disbursements." For this item there is a "schedule attached" itemizing the total sum of $6,744,109. This schedule 14 which breaks down the "Other Disbursements" to total exactly the total sum shown on the face of the regular report contains 11 specific items. These run as low as $897.66 and as high as $2,710,757.77. But the description of none of the items include any sum paid by way of "damages" to Boswell in any litigation, or to any other person. *Thus, if any sum was paid for "damages" to Boswell, it does not appear that the LM–2 report properly discloses it in any item.*

That, to me, would seem to be an item that a union member might seek to "verify" if there was any reasonable supposition for concluding that any substantial sum in "damages" had been paid. And since the LM–2 report is completely devoid of any indication as to what any such amount was, or that any such payment was made, it would seem that such facts would constitute "just cause" under the statute authorizing an examination of the relevant books and records of the Union. However, if there were no payment of damages in any settlement, the Union could adequately respond to the inquiry merely by stating that no such payment was made. If such were the case, inquiry by the Union member into the Union books would be foreclosed in the absence of some substantial showing that the statement might be incorrect.

If there is such an item as damages paid to Boswell to settle the litigation, and the Union contends that they filled out the report completely, that claim could be negated by pointing out that such item is not called for by the professional *fees* item and is not disclosed in the "Other Disbursements" item.

In addition to the foregoing, the magnitude of the "Professional Fees" item of $2,082,887, and the absence of any detailed specification of the expenditures it covered, cries out for closer examination. This is particularly so when the Union in schedule 14, "Other Disbursements," considered that they should disclose items as small as $897.66.