John H. MALLICK

v.

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,
Appellant,

Charles H. Pillard, et al.

No. 86–5158.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 29, 1987.
Decided March 17, 1987.

Terry R. Yellig, with whom Victoria L. Bor, Washington, D.C., was on brief, for appellant.

Paul Alan Levy, with whom Alan B. Morrison, Washington, D.C., was on brief, for appellee.

Before WALD, Chief Judge, STARR and DAVIS *, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

In *Mallick v. International Brotherhood of Electrical Workers*, 749 F.2d 771 (D.C.Cir.1984) (*Mallick I*), we held that under § 201(c) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 431(c), a union member has "just cause" to examine union records relating to "a sudden, apparently significant, and unexplained change in an item on his union's LM–2 [financial] reports,"[1] unless the union can demonstrate that the disclosure of this information will cause the union a "genuine harm" that "outweighs the strong policy favoring access for union members who have otherwise satisfied the statutory requirement for examination." *Id.* at 781, 785 (footnote omitted). We remanded the case to the District Court to determine whether the union could make such a showing. Upon remand, the District Court determined that the union (IBEW) raised "no issue of material fact, which could lead to a finding that the harm from disclosure would outweigh Mallick's statutorily protected interest." Joint Appendix (J.A.) at 15 (citation omitted). The District Court, therefore, granted plaintiff's motion for summary judgment and ordered that the union allow

plaintiff to examine all relevant records. 633 F.Supp. 867. *See* J.A. at 18–19. The union appealed this decision.

## I. Issues Arising From Mallick's Death

Ten days after the District Court entered judgment in favor of Mallick (January 31, 1986), Mallick died (February 10, 1986).[2] Although the death occurred before the union filed its notice of appeal, the union apparently did not learn of it until afterwards. In any event, the union filed its notice of appeal on February 28, 1986.

### A. *A Question of Procedure*

Rule 43(a) of the Federal Rules of Appellate Procedure provides that once a notice of appeal is filed, a substitution of parties, if any, is to "be affected in the court of appeals in accordance with this subdivision." In part, Rule 43(a) states: "If the deceased party has no representative, any party may suggest the death on the record and proceedings shall then be had as the court of appeals may direct."[3] Nevertheless, in this case, the IBEW first made a suggestion of death to the District Court and asked the District Court to vacate the judgment for this reason (March 24, 1986). In response to this motion, three of Mallick's fellow union members (Doyle, *et al.*) moved the District Court to substitute them for Mallick as plaintiffs in this action (April 21, 1986).

---

* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

1. An LM–2 Report is a financial report that a union is required to submit under § 201(b) of the LMRDA.

2. Mallick died without having examined the relevant union records.

3. In full, Federal Rule of Appellate Procedure 43(a) states:

If a party dies after a notice of appeal is filed or while a proceeding is otherwise pending in the court of appeals, the personal representative of the deceased party may be substituted as a party on motion filed by the representative or by any party with the clerk of the court of appeals. The motion of a party shall be served upon the representative in accordance

with the provisions of [Federal Rule of Appellate Procedure] 25. If the deceased party has no representative, any party may suggest the death on the record and proceedings shall then be had as the court of appeals may direct. If a party against whom an appeal may be taken dies after entry of a judgment or order in the district court but before a notice of appeal is filed, an appellant may proceed as if death had not occurred. After the notice of appeal is filed substitution shall be effected in the court of appeals in accordance with this subdivision. If a party entitled to appeal shall die before filing a notice of appeal, the notice of appeal may be filed by that party's personal representative, or, if there is no personal representative by that party's attorney of record within the time prescribed by these rules. After the notice of appeal is filed substitution shall be effected in the court of appeals in accordance with this subdivision.

While these motions were pending in the District Court, the union made a suggestion of death to this court and asked that we delay the briefing schedule for its appeal to allow the District Court to rule on the pending substitution and vacation motions. Although the union members opposed any delay to the proceedings in this court, they expressed a willingness to have the District Court rule on their substitution request. *See* Appellee's Opposition to Motion to Suspend Briefing Schedule Indefinitely at 3. We granted the union's motion to delay the briefing schedule in this appeal. *See* Order (June 10, 1986).

▪ Although the more normal course of proceeding under Fed.R.App.P. 43(a) is for this court to decide the substitution issue directly, the Rule provides that "proceedings shall ... be had as the court of appeals may direct." We believe that this flexibility, built into the Rule, allows us to take cognizance of the District Court's opinion on the issue—especially in a case where the parties themselves have chosen to proceed before the District Court. Following our decision to await its ruling, the District Court ruled in favor of Doyle, *et al.* and substituted the new plaintiffs in this case. J.A. at 20 (June 18, 1986). Having solicited the District Court's opinion on this issue, we will adopt its order as our own and will permit the substitution under Fed.R.App.P. 43(a), unless we are convinced by the appellant union's argument

that it is contrary to law. It is to that question we now turn.

### B. *Survivorship of LMRDA § 201(c) Claims*

Whether Mallick's action under § 201 of the LMRDA survives his death is a question of federal law. The Supreme Court has repeatedly held that the survivorship of a federal claim is itself an issue of federal law. Most recently, in holding that *Bivens* actions [4] survive the death of the wronged individual (at least in certain circumstances),[5] the Supreme Court stated: "*Bivens* actions are a creation of federal law and, therefore, the question of whether respondent's action survives [her son's] death, is a question of federal law." *Carlson v. Green*, 446 U.S. 14, 23, 100 S.Ct. 1468, 1474, 64 L.Ed.2d 15 (1980). Although the action in this case is a creation of a federal statute (whereas *Bivens* actions are not), the logic of *Carlson* dictates that federal law determines the survivorship of federal statutory claims, as they are evidently "creation[s] of federal law." Indeed, the Supreme Court has stated that the question of whether a federal statutory claim survives the death of one of the parties is essentially a question of how to interpret the statute that provides for the action. *Cox v. Roth*, 348 U.S. 207, 210, 75 S.Ct. 242, 244, 99 L.Ed. 260 (1955).[6]

The Supreme Court has further instructed that in deciding whether a federal action

---

**4.** *Bivens* actions are claims for damages against officers of the federal government for violations of federal constitutional rights, so named because the Supreme Court first affirmed the legitimacy of their existence in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**5.** *Carlson* specifically involved a case in which the victim of allegedly unconstitutional conduct died as a result of the conduct. While the Supreme Court held that a *Bivens* action certainly survived in those circumstances, the Court did not address whether *Bivens* actions survived in all circumstances.

**6.** In *Robertson v. Wegman*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), the Supreme Court held that state law governs whether a claim under 42 U.S.C. § 1983 survives the death of the claimant, unless the state law of survivorship is

"inconsistent" with federal law. The reason why § 1983 claims are treated differently from other federal actions for the purposes of survivorship is 42 U.S.C. § 1988, which declares that state law provides the rules of decision in § 1983 when federal law is "deficient" with regard to "suitable remedies" and state law is not "inconsistent" with federal law. *See Robertson*, 436 U.S. at 587, 98 S.Ct. at 1993. Since Congress did not provide for the survivorship of § 1983 claims, the Court viewed federal law to be "deficient" in this respect and held therefore that under § 1988 a Louisiana survivorship statute governed whether a § 1983 claim brought against Louisiana officials in a federal district court in Louisiana survived the death of the claimant. The Court suggested, however, that in some circumstances, federal law might preclude abatement of § 1983 claims, even if they would abate under state law. *See* 436 U.S. at 594, 98 S.Ct. at 1997.

survives the death of a party, courts should formulate a federal rule of decision that best serves the goals which underlie the federal right of action itself. In *Carlson,* the Supreme Court referred to "the deterrence goals" which "underlie *Bivens* actions" and held that "[a] uniform rule that claims such as respondent's survive the decedent's death is essential if we are not to frustrate in an important way the achievement of the goals of *Bivens* actions." 446 U.S. at 25, 100 S.Ct. at 1475 (footnote and internal quotation omitted). The Supreme Court explained that deterrence of unconstitutional conduct requires that "[a] federal official contemplating unconstitutional conduct ... be prepared to face the prospect of a *Bivens* action" and that this principle would not be well served if *Bivens* actions abate when the victims of unconstitutional conduct die (especially when the death is a result of the unconstitutional conduct).

When an Act of Congress has created the action at issue, the role of the courts in deciding the survivorship issue is to effectuate the will of Congress as best they can. As the Supreme Court observed in *Cox v. Roth, supra,* the fact that Congress has failed to provide a clause on survivorship to accompany the statute granting the right of action does not necessarily mean that Congress intended that the action abate upon the death of a party. Quoting its earlier opinion in *Markham v. Cabell,* 326 U.S. 404, 409, 66 S.Ct. 193, 195, 90 L.Ed. 165 (1945), the Court in *Cox v. Roth* stated: "The policy as well as the letter of the law is a guide to decision. Resort to the policy of a law may be had to ameliorate its seeming harshness or to qualify its apparent absolutes." 348 U.S. at 209, 75 S.Ct. at 244. In *Cox v. Roth,* the Supreme Court specifically held that a suit under the Jones Act survives the death of the tortfeasor. The Court reasoned that references in the Jones Act to the earlier Federal Employers' Liability Act, in which Congress had provided for tort claims against railroads in receivership, suggested that Congress would similarly not wish the "death of the tortfeasor to defeat recovery under the Jones Act." *Id.*

Applying the approach to survivorship questions set forth by the Supreme Court in *Carlson v. Green* and *Cox v. Roth,* we hold that Mallick's lawsuit under § 201 of the LMRDA survives his death, thereby allowing the substitution of Mallick's fellow union members as plaintiffs. First, as with *Bivens* actions, deterrence of wrongful conduct is a major goal underlying the authorization for union member lawsuits in § 201 of the LMRDA. In *Mallick I,* we quoted at length from the House Report reflecting that deterrence motivation. *See* 749 F.2d at 780. We will not repeat the relevant passage in its entirety here. For our purposes, it is sufficient to note that after acknowledging the existence of abuses by union leaders in managing union funds and union affairs, the House Report asserted:

> It is the purpose of this bill to insure that full information concerning the financial and administrative practices and procedures of labor organizations shall be ... available to the members of such organizations.... By such disclosure, and by relying on voluntary action by members of labor organizations, *it is hoped that a deterrent to abuses will be established.*

H.R.Rep. No. 741, 86th Cong., 1st Sess. 8 (1959) (emphasis added). This goal of deterrence is best served by allowing the § 201 lawsuit to survive the death of the particular union member who happens to initiate the action and by substituting for the decedent other union members who seek the same information and come forward as willing plaintiffs. As in *Carlson,* union officials contemplating abusive conduct must know that they are readily accountable through § 201 lawsuits to verify the union's reports. The congressional goal of deterring official abuse will be frustrated if unions can avoid disclosing information through protracted recalcitrance made possible, in part, by the abatement of § 201 lawsuits upon the death of an individual plaintiff. In any event, a rule allowing survival and substitution would certainly "prevent frustrations of the deterrence

goals of [the LMRDA]." *Carlson,* 446 U.S. at 25, 100 S.Ct. at 1475.

Second, although Congress has not expressly provided for the survival of § 201(c) lawsuits, the language of the statute reveals why their survival, and the substitution of the decedent's fellow union members, is appropriate.

> Every labor organization required to submit a report under this subchapter shall make available the information required to be contained in the report to *all* of its members, and every such labor organization and its officers shall be under a duty enforceable at the suit of *any* member of such organization [in state or federal court] to permit such member for just cause to examine any books, records, and accounts necessary to verify such report.

29 U.S.C. § 431(c) (emphasis added). As this language shows, the right to disclosure established by Congress is one shared without differentiation among all union members; they all have an equal right for just cause to inspect union records. Since the union is under the same duty to all members enforceable by any of its members, it should not matter who the particular plaintiff is at any particular point in the lawsuit. Indeed, it would be violative of the avowed purpose of Congress to insure access of all members to "full information" concerning their union's financial and administrative practices to say that a lawsuit seeking this kind of information abates, when several union members are still seeking the same information, simply because the particular union member who initiated the lawsuit happened to die. Rather, precisely because they have the same right to inspection, we must assume that Congress would wish any other union member to be able, upon timely application, to complete a § 201 suit initiated by a now-deceased fellow member.

In opposing the substitution of Doyle, *et al.,* the IBEW cites cases drawing a distinction "between suits based on claims personal to the plaintiff, such as actions for injury sounding in tort, and those seeking vindication of some right of property or contract." *Almour v. Pace,* 193 F.2d 699, 700 n. 2 (D.C.Cir.1951) (quoted in Appellants' Brief at 17). According to these cases, "personal claims abate on the theory that the rights and duties die with the person, while actions concerning property survive since they affect the estate of the deceased." *Id.* Although the IBEW concedes deterrence as a major goal of the LMRDA, it argues that according to these cases, the § 201(c) claim must be considered personal and therefore must abate with Mallick's claim.

The quick answer to this contention is that these cases no longer control adjudication of survivorship issues associated with federal claims, as the Supreme Court's opinion in *Carlson v. Green* and *Cox v. Roth* make perfectly plain. The Supreme Court obviously could not have reached the result, or used the reasoning, that it did in *Carlson* if the formalistic approach advocated by the IBEW remained the law. Indeed, in *Cox v. Roth,* the Supreme Court explicitly repudiated this earlier approach to survivorship issues as incompatible with a proper interpretation of the Jones Act: "The extreme harshness of the old common-law rule abating actions on the death of the tortfeasor flies in the face of the expressed congressional purpose to provide for the 'the welfare of seamen.'" 348 U.S. at 210, 75 S.Ct. at 244. The Supreme Court then made plain that, regardless of the common-law approach, it must adopt the rule of decision most faithful to the statute at hand.

Another reason why the approach advocated by the IBEW no longer governs cases involving federal statutory rights is the difficulty of forcing many newer statutory rights into its somewhat archaic and rigid distinction between personal and property claims. These categories simply do not fit the right of action created in § 201 of the LMRDA. Consequently, in deciding whether these actions abate or survive, we must use as a guide the purposes underlying the statute. As we have seen, these purposes favor a rule allowing the § 201(c) suit to survive a particular union member's death and other union members to substitute themselves as plaintiffs so that they can complete the effort to obtain the infor-

mation, which is owed to all union members.

Finally, we note that the Federal Rules do not bar the substitution of Doyle, *et al.* in this lawsuit. As we have stated, Fed. Rule App.P. 43(a) grants this court the discretion to provide for the substitution of appropriate parties to assure the fair and efficient administration of justice. Indeed, under the permissive rules for joinder and intervention of parties, there is no doubt that, prior to Mallick's death, the District Court could have allowed Doyle, *et al.* to join or intervene in Mallick's lawsuit. *See* Fed.Rules Civ.P. 20(a), 24(b). Given the nature of the right granted in § 201(c) of the LMRDA, there is no sensible basis for construing the procedural rules governing substitution of parties, *see* Fed.R.App.P. 43(a), Fed.Rule Civ.P. 25(a), more rigidly than the rules providing for joinder and intervention of parties. Thus, we adopt the District Court's decision ordering substitution of Doyle, *et al.* in this case, and proceed to the merits of the IBEW's appeal.

## II. THE UNION'S OBLIGATION TO RELEASE ITS RECORDS

■ The IBEW raises three challenges to the District Court's January order granting summary judgment against it.

### A. *The Adequacy of Mallick's Stated Requests to Examine Union Records*

The IBEW first contends that Mallick failed to make a proper pre-litigation demand. Although the union acknowledges that the statute does not explicitly require any "pre-litigation demand," the IBEW claims that "[a]mong the prerequisites to the right to examine a union's records pursuant to Section 201(c) is that the requesting party make a demand on the union which demonstrates his or her claim of just cause to seek examination." Appellants' Brief at 33. The IBEW attacks the District Court's decision ordering the union to disclose its records as overlooking this "prerequisite."

According to the IBEW, a union member cannot satisfy this prerequisite unless he or she explains to the union that the infor-

mation is requested to verify an LM-2 report. Thus, the IBEW argues that neither before nor during this lawsuit did Mallick actually state that the reason he wished to examine the union's records was to verify an IBEW LM-2 report. In the union's own words, "Mallick never articulated a connection between the IBEW's 1980-81 LM-2 report and his request for documents, although given ample opportunity to do so. Indeed, even as late as his July 10, 1985 deposition, Mr. Mallick still did not appear to see any particular link between any items in the LM-2 report and his request...." Appellants' Brief at 37.

This contention is entirely spurious. First of all, it has been evident to IBEW from the beginning what information plaintiffs seek and why they seek it. As we detailed in *Mallick I*, 749 F.2d at 773-74, the information requested concerns litigation expenses that the IBEW incurred while defending another LMRDA lawsuit known as the *Boswell* case. The IBEW's 1980-81 LM-2 report showed an unexpected drop between $300,000 and $400,000 in the balance of a special reserve fund the IBEW maintains for legal expenses, *id.* at 775, and plaintiffs seek to determine whether this unexpected drop represents the cost of litigating the *Boswell* case. *Id.* at 776.

Second, the IBEW's assertion about Mallick's deposition is incorrect. His deposition testimony shows that he "articulated a connection between the IBEW's 1980-81 LM-2 report and his request for documents." Appellants' Brief at 37. When asked by IBEW's counsel whether he knew "of any of the financial terms of the settlement of the *Boswell* case," Mallick responded: "No. Only that there was—like it showed like a six figure digit—[sic] ... in the LM-2 report was unaccounted for. You get nosey." Mallick Deposition at 28–29. When the counsel for the union then said, "I don't understand. What do you mean?" Mallick replied: "Well, if you see like a $300,000 discrepancy, if you see where there was $300,000 spent, and you don't know why, you try to find out why.

So I just figured that part of that went to Boswell. I didn't know what part." *Id.*

Third, Mallick's verified complaint in this lawsuit, which is equivalent to a sworn affidavit, also articulates a connection between the LM–2 report and the information sought. The complaint reads:

> The IBEW has filed with the Department of Labor financial reports, known as Forms LM–2, for the fiscal years beginning July 1, 1979 and July 1, 1980. On neither form does the IBEW indicate that a specific amount of money was expended in connection with *Boswell v. IBEW*. The form for 1980–1981 does, however, indicate that the reserve for the Defense Fund dropped by almost $400,000 during that year....
>
> By learning how much Boswell and his counsel were paid, and what records the IBEW obtained to determine the appropriate amount of these payments, plaintiff MALLICK and all other members of the IBEW will be aided in determining whether the payments were excessive or otherwise improper.

Complaint for Injunctive Relief at 4–5 (April 19, 1982).

Finally, it is evident from the pre-litigation correspondence between the parties' counsel that the union knew that Mallick was seeking information relating to the *Boswell* litigation expenses pursuant to his statutory right to verify his union's LM–2 reports. Indeed, in a letter written to Mallick's counsel, the IBEW's attorney states: "You have cited several sections of the LMRDA in support of your client's request.... The one LMRDA section covering disclosure of union records, Section 201(c), requires disclosure when a member demonstrates 'just cause' to examine documents necessary to verify the union's LM–2 report." Letter of Laurence J. Cohen (February 26, 1982), identified in the record as Exhibit J to Plaintiff's Motion for Summary Judgment (June 18, 1982). Of course, it is true that from the beginning

the IBEW had a different interpretation of § 201 than Mallick had. Our decision in *Mallick I* resolved this dispute. Nonetheless, as this letter shows, prior to the commencement of this lawsuit, the IBEW was on notice that Mallick was requesting the information pursuant to his § 201 rights. Thus, even if we assume that in order to examine union records, a union member must explain to the union that he requests the information in order to verify an LM–2 report, as provided in § 201, such a requirement has been amply satisfied in this case.[7]

### B. *The Proper Scope of the Remand after* Mallick I

The IBEW's next challenge to the District Court's decision is that it "does not address the issue of whether Mr. Mallick satisfied his burden of proving 'just cause' sufficient to satisfy Section 201(c)." Appellants' Brief at 38. The union, however, misreads *Mallick I* in arguing that on remand Mallick was required to introduce further evidence to establish just cause. *Mallick I* held that plaintiff had established what amounted to a "prima facie" right to inspect the IBEW's records relating to litigation expenses. *Mallick I* decided that "when the union's LM–2 reports show abrupt and unexplained shifts, a union may not simply dig in its heels and refuse to explain what the change means." 749 F.2d at 781. Moreover, the court went on to say "Mallick has clearly satisfied this principle.... [T]he 8% change in the balance of the [IBEW's Litigation] Defense Fund was far greater than changes in preceding years, and the significance of the change was entirely unclear." *Id.* at 783. Thus, from these facts alone, which were in the record at the time of *Mallick I*, plaintiff had established a presumption that he was entitled to examine the union records. The only question that remained was whether "even if Mallick is otherwise entitled to

---

**7.** Finally, we note that in a subsequent letter to Mallick's counsel, the union waived its rights to challenge pre-litigation procedural defects relating to Mallick's failure to pursue his claim internally within the union before initiating this lawsuit. *See* Letter of Laurence J. Cohen (March 9, 1982), identified in the record as Plaintiff's Exhibit J in support of a Motion for Summary Judgment (June 18, 1982).

inspect the records," the union could introduce sufficient evidence of harm to "defeat Mallick's request for examination." *Id.*

The IBEW points to a sentence in *Mallick I* stating that plaintiff had "gone a very long way to proving just cause." 749 F.2d at 784. The union reads this sentence as requiring plaintiff on remand to present additional evidence "to go the rest of the way." Appellants' Brief at 49. This language, however, does not carry the implication ascribed to it by the union. Rather, this court meant simply that just cause is not conclusively established until after the union member's showing is evaluated together with the union's evidence of harm.[8]

In this case, plaintiff was not required to offer any additional evidence establishing just cause unless the union introduced evidence of harm from disclosure that sufficiently negated plaintiff's initial showing. The correctness of this interpretation of *Mallick I* can best be demonstrated by the opinion's concluding sentences on the subject:

> If the IBEW demonstrates that disclosure of this information would be comparable to, for example, a corporation's disclosure of trade secrets, ... then examination should be refused. *If, however, the IBEW's fears prove speculative and remote, Mallick's request should be granted.*

749 F.2d at 785 (emphasis added). The District Court properly understood and carried out the instructions of this court in focusing on this question on remand. Consequently, the union's claim that the District Court erred by not demanding additional proof of "just cause" lacks merit.

C. *The IBEW's Assertion of Harm*

The IBEW's final argument is that on remand it proffered a sufficient showing of harm to defeat plaintiff's motion for summary judgment. We disagree. The District Court was correct in concluding that the IBEW failed to raise a genuine issue of material fact because the harm asserted by the IBEW in its submissions was not one which would outweigh the union member's interest in disclosure. J.A. at 15. Therefore, summary judgment against the defendants was proper. *See* Fed.R.Civ.P. 56(c).

In *Mallick I*, we held that "the strong [congressional] policy favoring access to [records] for union members who have otherwise satisfied the statutory requirements for examination" requires that the harm from disclosure be "genuine" and "significant." 749 F.2d at 785. As examples of cases in which the union would meet this burden we observed that the information requested should not be revealed if doing so would lead to the public dissemination of a union's organizing strategy or negotiating plan. We also stated that the harm to a union's financial interests, which allegedly would result from disclosure of the requested information, would have to be comparable to the harm to a corporation caused by disclosure of its trade secrets or confidential earnings protections. In remanding the case to the District Court, we instructed that the specific harm alleged by the union must outweigh the specific interest asserted by the union member.

In this case, the union members' interest in disclosure is basic to the entire purpose of the LMRDA. Members of the IBEW have observed a precipitous drop in the union's legal defense account, as listed in its LM–2 report, and seek to examine relevant union records in order to substantiate or refute their belief that this drop reflects their union's policy of defending LMRDA lawsuits without regard to cost or the in-

---

**8.** Employment discrimination cases provide a useful analogy. *See, e.g., Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Segar v. Smith,* 738 F.2d 1249 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2317, 86 L.Ed.2d 258 (1985). Even after a prima facie case has been made out, a court cannot say that in a Title VII case plaintiff has conclusively established that discrimination has occurred until the court entertains defendant's evidence as to a legitimate reason for its personnel action. If the defendant does not introduce any such evidence, then plaintiff has conclusively proved discrimination without providing any additional proof. However, if the defendant does offer evidence of a legitimate explanation for the employment decision, then the court must weigh the evidence to determine if plaintiff has gone far enough or must go further.

terests of the membership. *See Mallick I,* 749 F.2d at 774, 776. The *Boswell* case, we recall, involved a union member's claim under the free speech provision of the LMRDA. *See* 29 U.S.C. § 411(a)(2). *If* the IBEW spent substantial—even excessive—sums of money to litigate the *Boswell* case, this information may reflect costly intransigence on the part of the union leadership "simply to discourage members from bringing such [LMRDA] lawsuits." 749 F.2d at 774. How the union leadership responds to LMRDA claims is obviously a valid concern to the union's rank-and-file members. Since the LMRDA specifically grants union members union democracy rights like the free speech right at issue in the *Boswell* case, the policy of the Act obviously favors disclosure of information to verify an indication in an LM–2 report that the union is hostile to, or at least unsolicitous of, these LMRDA rights.

Once again we refer to passages from the House Report, which we quoted extensively in *Mallick I,* 749 F.2d at 780:

The members of a labor organization are the real owners of the money and property. Because such union funds belong to members they should be expended only in the common interest....

.    .    .    .    .

Similarly the rules governing the conduct of the union's business, such as *dues and assessments payable by members, membership rights, disciplinary procedures, election of officers, provisions governing the calling of regular and special meetings* —all should be known to the members. Without such information freely available it is impossible that labor organizations can be truly responsive to their members.

It is the purpose of this bill to insure that full information concerning the financial and internal administrative practices and procedures of labor organizations shall be ... available to the members of such organizations....

H.R.Rep. No. 741 at 7–8 (emphasis added). The matters underscored in the above excerpt are precisely those about which the LMRDA grants union members specific rights in the "Bill of Rights of Members of Labor Organizations." *See* 29 U.S.C. § 411. Because a strong congressional policy supports full disclosure on these matters, records demonstrating how the union leadership planned to treat these rights and handle these matters is precisely the kind of information that Congress intended to be disclosed. Under these circumstances, the union must demonstrate an especially severe harm in order to override the union member's right to inspect the relevant documents.

On remand, the IBEW asserted that the disclosure of the union's expenses for litigating the *Boswell* case was likely to encourage frivolous lawsuits and higher litigation-related expenditures for the union generally. But *this harm,* even if true, cannot outweigh the strong interest in disclosure in this case. If the union, in fact, incurs more litigation expenses as a result of defending an increased number of LMRDA lawsuits, then this price must be paid for the vindication of the union membership's LMRDA rights. An increase in LMRDA suits against the IBEW does not necessarily mean that the additional suits are frivolous. Rather, if the union has managed to discourage legitimate LMRDA claims with a tactic of defending these claims at all costs, then an increase in the number of LMRDA claims would most likely represent meritorious claims that the union has heretofore been able to squelch. If disclosure of the union's litigation expenses caused an increase in *these* LMRDA claims, then the fundamental policies of the Act would be served by the disclosure. Furthermore, even if a portion of the increased number of claims turn out to be frivolous, this result must be viewed as an unfortunate but necessary by-product of the legitimate interest in disclosure. Whenever a statute guarantees a right and grants a cause of action to enforce that right, the possibility of frivolous claims inevitably exists. Under the Act, however, the vindication of meritorious LMRDA claims necessarily outweighs the threat of frivolous LMRDA claims.

Consequently, in asserting that disclosure of the requested information will lead to increased LMRDA litigation, the union has failed to allege a harm which, even if proved, would cause the court to deny disclosure. In these circumstances, the District Court was correct in granting summary judgment against the defendants. *See, e.g., Anderson v. Liberty Lobby, Inc.,* — U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

CONCLUSION

On remand, the IBEW offered no good reason for refusing to allow union members to inspect records relating to the *Boswell* case, and apparently the union has none. Instead, the union has tried to avoid disclosure by claiming that Mallick did not sufficiently articulate or prove his just cause to the information and that, now Mallick has died, his fellow union members cannot seek disclosure in this lawsuit. But the union's tactics for avoiding disclosure have no legal merit. First, Mallick made sufficient statements to the union to put it on notice of the information sought and the reasons for seeking it. Second, at the time of our decision in *Mallick I* the record contained sufficient evidence of just cause to require the union to demonstrate a harm that would be caused by disclosure. Third, both the nature of the right provided in LMRDA § 201 and the policies underlying that right favor a rule allowing substitution of other union members after Mallick's death: when the right of union members to inspect certain union records has been established, it is evident that Congress would prefer that union members seeking this information receive it, rather than that the union be able to prolong its recalcitrance, as the union in this case has tried to do.

Thus, we affirm the District Court's order of January 31, 1986 granting plaintiff's motion for summary judgment. Furthermore, because we have approved the substitution of Doyle, *et al.* as plaintiffs in this case, we affirm the District Court's order of June 18, 1986, requiring the union to allow these union members to inspect the requested union records.

*Affirmed.*