J. Anthony SMITH, et al., Plaintiffs,

v.

William J. McCARTHY, et al.,
Defendants.

Civ. A. No. 88–3602.

United States District Court,
District of Columbia.

Sept. 13, 1989.

Paul Alan Levy and Alan B. Morrison, Washington, D.C., for plaintiffs.

Gary S. Witlen and Patrick J. Riley, Washington, D.C., for defendants.

MEMORANDUM

GESELL, District Judge.

This is an action for declaratory and injunctive relief brought under the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"). Plaintiffs, dissident members of the International Brotherhood of Teamsters ("IBT"), have moved for summary judgment and defendants, the IBT, William J. McCarthy, General President of the IBT, and Weldon Mathis, its General Secretary–Treasurer, have opposed. For the reasons stated below, the Court grants plaintiffs' motion for summary judgment and directs the injunctive relief requested, costs of this action and attorney fees.

J. Anthony Smith and Joseph P. Day IV filed this action against IBT. They are members of both the IBT and Teamsters for a Democratic Union ("TDU"), an organization whose aim is to reform the IBT. They seek information about the management of IBT finances, and they ask the Court to compel defendants to permit plaintiffs and their representatives to examine and obtain copies of certain IBT books and records for the years 1987 to the present. Their demand is well defined. They seek to discover (1) the entities in which IBT funds and assets are invested, including stocks, bonds, commercial paper, insurance contracts, repurchase agreements and other forms of investments, and the entities from which IBT has received investment revenues either in the form of dividends, interest or similar payments, or from the sale of investment instruments; and (2) all transactions in commercial paper. As will be indicated, this simple demand reflects a long-standing controversy within the union.

The Court has jurisdiction pursuant to Section 201 of the LMRDA, 29 U.S.C. § 431. That provision requires labor organizations to file an annual financial report—a so-called LM–2—with the Secretary of Labor. Pursuant to § 431(c), a labor organization filing such a report must permit any of its members "for just cause to examine any books, records, and accounts necessary to verify such report" and such duty is enforceable in U.S. District Court. Plaintiffs seek to verify figures in IBT's 1987 and 1988 LM–2 reports.

Plaintiffs assert two reasons they feel they have just cause to inspect the records at issue. First, TDU has been accused by IBT and Teamster local officials of receiving money from employers. In order to offset those charges, plaintiffs wish to discover whether and the extent to which the IBT itself has engaged in investment practices similar to those that give rise to the accusations against TDU. Second, plaintiffs noticed in IBT's 1987 LM–2 that IBT had bought and sold some $1.5 billion in commercial paper in a single year. They assert that such a volume of trading raises a question whether IBT officers or their agents are "churning" those investments in order to generate commissions. Accordingly, they wish to examine records concerning the union's transactions in commercial paper to determine whether their suspicions are justified.

The facts underlying the first of the two reasons are evident from the record. The basis of the charge that TDU is receiving money from employers is apparently that the Teamster Rank–and–File Education and Legal Defense Fund ("TRF"), a foundation associated with TDU, has received grants from foundations which in turn receive corporate stock dividends from some employer companies. These charges were apparently first made by BLAST (Brotherhood of Loyal Americans and Strong Teamsters), a group of Teamsters allegedly sympathetic to IBT officials. In October 1988, Ron Owens, President of Teamsters Local 299 repeated the charges and asserted that the alleged employer contributions to TDU put TDU in violation of 29 U.S.C. § 481(g), which forbids employer contributions to

promote candidates for union office. Apparently, IBT employees spread Owens's accusations across the country, and they were repeated at union meetings and elsewhere.

IBT's 1987 LM–2 shows that IBT owned about $13 million in common stock, $57 million in corporate bonds, $8.5 million in commercial paper, and $15 million in insurance contracts as of December 31, 1987. On this basis, plaintiffs assert their belief that the IBT receives money in a manner similar to contributors to the TRF, *i.e.,* the IBT receives dividends and other returns on investments in employer companies.

As to the facts underlying the second reason for plaintiffs' request, they simply point to the volume of commercial paper transactions reflected in the IBT 1987 LM–2—$1.505 billion purchased and $1.506 billion sold in one year—and assert that such volume raises a concern that either IBT officials are churning those investments to create commissions for a favored individual or that inadequate monitoring of such investments has permitted churning.

Although defendants strongly contend to the contrary, each of plaintiffs' reasons is sufficient to support access to the underlying IBT records.

The leading case in this Circuit, *Mallick v. International Brotherhood of Electrical Workers,* 749 F.2d 771 (D.C.Cir.1984), upheld a retired union member's effort to discover how much his union had spent on a particular litigation matter. After holding that a significant change in the union's LM–2 report was sufficient to satisfy the "necessary to verify" standard of § 431(c), *Mallick* adopted a broader reading of the § 431(c) standard, noting that cases interpreting the "necessary to verify" standard "have generally rejected a cramped literalism." The court noted in *Mallick* the Supreme Court's earlier warning to lower courts interpreting the LMRDA that they "must look to the objectives Congress sought to achieve, and avoid ' "placing great emphasis upon close construction of the words." ' " *United Steelworkers v. Sadlowski,* 457 U.S. 102, 111, 102 S.Ct.

2339, 2345, 72 L.Ed.2d 707 (1982), *quoted in Mallick*, 749 F.2d at 776. The legislative history of the LMRDA reveals a widespread congressional concern for disclosure of union information to the rank and file in order to prevent autocratic rule. *Id.* at 776–81.

*Mallick* cited with approval such cases as *Fruit & Vegetable Packers and Warehousemen Local 760 v. Morley*, 378 F.2d 738, 744 (9th Cir.1967), where the court interpreted the just cause standard of § 431(c) sufficiently broadly to support the request at issue here:

> The standard for determining whether there was just cause is necessarily minimal. Just cause need not be shown beyond a reasonable doubt, nor by a preponderance of the evidence. It need not be enough to convince a reasonable man that some wrong has been done; it is enough if a reasonable union member would be put to further inquiry.... [t]he test must be whether reason would require substantiation.

*Mallick* accordingly rejected "the theory that a subsection 201(c) [431[c]] claimant must show outright error or grossly suspicious items on the LM–2 report," stating that "[t]ypically, union members will be interested in looking at underlying records precisely because they believe the LM–2 reports *are* accurate, and raise questions about the handling of union funds." 749 F.2d at 781, 783.

■ The plaintiffs' first reason for seeking access to IBT records—to determine whether the IBT, through its investments, is receiving money from employers, as IBT officials have accused the TDU of doing—meets the § 431(c) standard as interpreted in *Mallick*. The 1987 IBT LM–2 form, when coupled with the public charges against TDU, might lead a reasonable union member to want to know more about IBT investments and to verify the LM–2 in the sense of discovering whether the figures underlying the LM–2, *i.e.*, the specific investment holdings and transactions reflected in the LM–2, were consistent with the impression left by public statements of IBT and Teamster local officials, *i.e.*, that the IBT itself receives no income from securities in employer companies.

The IBT in its brief takes the position that investments by unions or foundations in securities of employers are not illegal, but legality is not the issue. The IBT officials who levelled the charges against TDU presumably felt such charges would weaken TDU's credibility with union members who would prefer that such investments, legal or not, be avoided. Given that the charges might well have had some influence on Teamster members and other concerned parties, plaintiffs have just cause to examine IBT records to determine whether IBT has engaged in similar practices and, if so, to counter the charges IBT officials have made against TDU.

■ The plaintiffs' second reason for seeking access to IBT records—to investigate whether IBT officials are "churning" investments in commercial paper—also fits under *Mallick*. The volume of commercial paper transactions reflected in the IBT's 1987 LM–2 might indeed be sufficient to lead a reasonable union member to question the purpose of what plaintiffs assert and defendants do not deny to be rapid turnover. Thus plaintiffs have demonstrated just cause to examine the IBT's commercial paper records.

■ Section 431 provides that a court, in an action to force compliance with the section, may in its discretion award the plaintiff attorney fees to be paid by the defendant and costs of the action. As the LMRDA is a remedial statute, attorney fees are appropriate absent special circumstances rendering such an award unjust. *Landry v. Sabine Independent Seamen's Association*, 623 F.2d 347, 350 (5th Cir. 1980). The Court finds no such special circumstances here and therefore will award reasonable attorney's fees to the plaintiff as well as the injunctive relief requested. An appropriate order accompanies this memorandum.

## ORDER

For the reasons set forth in the Court's Memorandum filed herewith, summary

**176**

judgment is granted to the plaintiffs, together with costs and reasonable attorney fees, to be determined. Plaintiffs and their representatives may inspect and obtain copies of the IBT books and records that reveal for the years 1987 to the present (1) the entities in which IBT funds and assets are invested, including stocks, bonds, commercial paper, insurance contracts, repurchase agreements and other forms of investments, and the entities from which IBT has received investment revenues either in the form of dividends, interest or similar payments, or from the sale of investment instruments; and (2) all transactions in commercial paper.

As to plaintiffs' attorney fees, counsel's attention is directed to Rule 215(a) of the Rules of this Court and a status conference on attorney fees, as directed therein, shall be held on October 2, 1989, at 9:00 a.m.

Costs of this action are granted to plaintiffs and shall be fixed by the Clerk of Court.