**John N. HAYES and James E. Larsen**

v.

**INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS.**

**Civ. No. PN–87–1084.**

United States District Court,
D. Maryland.

May 3, 1990.

Arthur L. Fox, II, Cornish F. Hitchcock, Paul Alan Levy and Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

W. Michael Pierson, Baltimore, Md., and Burton Epstein, Steinberg & Tugendrajch, New York City, for defendant.

**OPINION AND ORDER**

NIEMEYER, District Judge.

Plaintiffs seek attorneys' fees and expenses incurred in prosecuting this action

against and obtaining a settlement from the defendant union. The action was brought by plaintiffs under Title I of the Labor Management Reporting and Disclosure Act of 1959 ("the LMRDA"), 29 U.S.C. § 401 *et seq.* (1982). They obtained a limited preliminary injunction but were denied a summary judgment because material facts were in dispute. Before trial the action was terminated by a voluntary settlement reached by the parties. Plaintiffs now seek $73,925.60 for reimbursement of attorneys' fees and expenses. For the reasons given hereafter, the Court will award $54,225.36.

## I.

In 1984 John Hayes was elected a member of the General Executive Board ("the Board") of the International Organization of Masters, Mates & Pilots ("MM & P" or "the Union"). He served as the MM & P's Vice President—Atlantic Ports. The parties agree that Mr. Hayes was an outspoken critic of the Union's leadership during his tenure on the Board. The Union contends moreover that Hayes disrupted and harmed the Union's interests. On the other hand, the plaintiffs contend that Hayes merely exercised his rights of free speech in criticizing the Union leadership, especially in its handling of the Union members' pension funds.

In the summer of 1985, Hayes reported his criticism of the Union's handling of pension funds to the "Journal of Commerce" and to the United States Department of Labor. Soon thereafter, in October 1985, the Board promulgated a "gag" rule, which provided that:

no employee, representative or member of the [Board] shall give any statement or information relating to the organization, or its benefit plans, either directly or indirectly, to any representative of the press or other media unless approved in advance by the International subcommittee ... who may consult with counsel to insure the protection of individual rights. It is further resolved that any violation of this resolution and action by the [Board] shall be grounds for discharge or

for suspension or removal from office. . . .

Hayes contends that this "gag" rule was enacted pursuant to Article IX, Section 3(a)(5) of the MM & P constitution, which provides: "[t]he basis for [disciplinary] charges against any member of the Organization shall be as follows: ... abuse of fellow members by libelous or slanderous communications."

After the Department of Labor filed suit against certain MM & P officers and board members in early March 1987, other members of the Board initiated a recall referendum of Hayes and suspended him without pay from his office pending the outcome of the referendum. The Union has contended that Hayes' suspension was due solely to his disruptive activities. Hayes claims that his suspension was part of an ongoing campaign by the Board to stifle dissent and politically harass those not loyal to the MM & P president, Robert J. Lowen.

According to Hayes, on April 3, 1987, he asked the MM & P controller, Harry Seidman, for the opportunity to send out a mailing to members concerning the recall referendum before or at the same time as the ballots were mailed. On April 8, 1987, however, the MM & P mailed the recall ballots, together with a so-called "indictment" of Hayes, without Hayes' mailing. Then, on April 14, 1987, the MM & P mailed a letter urging Hayes' recall. It was not until April 20, 1987, that the MM & P mailed Hayes' literature.

Hayes and James Larsen thereafter filed the pending action and requested a preliminary injunction to reinstate Hayes and enjoin the recall vote because Hayes was denied his input to many members before they voted. Larsen joined as a plaintiff alleging that the Union deprived him of the opportunity to participate indirectly in the governance of the Union through his elected representative, Hayes. In their complaint, which was subsequently amended, the plaintiffs allege that Hayes was impermissibly suspended from office pursuant to § 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2), that the recall election was con-

ducted in violation of § 101(a)(1) and (2) of the LMRDA, 29 U.S.C. § 411(a)(1) and (2), and that the Union violated its members' free speech rights. The plaintiffs were successful in obtaining a preliminary injunction on June 8, 1987, which reinstated Hayes to office pending the outcome of any recall referendum the MM & P chose to conduct and impounded and sealed the recall ballots until further court order. *Hayes v. Organization of Master, Mates and Pilots*, 670 F.Supp. 1330 (D.Md.1987). Hayes remained on the Board pursuant to this order until he was defeated in a regularly scheduled election in December 1988.

On July 20, 1987, plaintiffs filed a motion for summary judgment in which they sought judgment on all claims as a matter of law. The motion was denied, the Court finding that trial was necessary to resolve disputes of material facts. The parties thereafter settled the case by agreement. The settlement agreement provided that Hayes receive back pay and benefits for the period he was suspended from the Board, that the Union publish in the Union newsletter a recommendation by the Board that Article IX, Section 3(a)(5) of the Union's constitution be repealed, and that the ballots received in the recall referendum be destroyed. The case was voluntarily dismissed with prejudice, except for this claim for attorneys' fees, expenses and costs, which was reserved by the parties.

## II.

■ The thrust of plaintiffs' complaint alleges violations of the Bill of Rights of Members of Labor Organizations as contained in Title I, § 101(a)(1) and (2) of the LMRDA, 29 U.S.C. § 411(a)(1) and (2). Subsection (a)(1) entitles union members to equal rights and privileges within the labor organization and subsection (a)(2) protects members' rights of free speech and assembly. Section 102 of the LMRDA, 29 U.S.C. § 412, which sets forth the civil remedies for a violation of § 101, gives federal courts the power to grant "such relief (including injunctions) as may be appropriate." But significantly it does not expressly provide for awards of attorneys' fees. In this way § 102 differs from other sec-

tions of the LMRDA which do expressly provide for awards of attorneys' fees. *See, e.g.*, § 201(c), 29 U.S.C. § 431(c).

The plaintiffs urge this Court to adopt a standard under § 102 of the LMRDA for awarding attorneys' fees which is akin to the standard applied under statutes which expressly provide for such fee awards, *i.e.*, that attorneys' fees should be awarded absent special circumstances rendering such awards unjust. As support for this contention, the plaintiffs cite *Landry v. Sabine Independent Seamen's Ass'n*, 623 F.2d 347 (5th Cir.1980), and *Smith v. McCarthy*, 723 F.Supp. 173 (D.D.C.1989). They argue that the fact that *Landry* was brought under Title II of the LMRDA rather than Title I is irrelevant, because the court's reasoning does not confine the scope of its holding. Plaintiffs also argue that the omission of a fee-shifting provision under Title I, which was added on the floor of the Senate, was accidental and that the legislative deliberations as well as logic suggest that a fee-shifting provision should be inferred. *See* Comment, *Labor Law—Mandatory Attorney's Fees—Section 102 Labor–Management Reporting and Disclosure Act Hall v. Cole, 93 S.Ct.1943 (1973)*, 51 Denver L.J. 169, 176 (1974).

Whether the omission of a fee-shifting provision in Title I of the LMRDA was accidental, foolish, or illogical, the plain fact remains that Title I makes no provision for the award of fees to the successful plaintiff. It is for the Congress, not the courts, to add such a provision if that is the will of Congress. It is significant that in the 30 years or so since enactment of the LMRDA, no amendment has been made to add such a provision to Title I. That could be in part because of the Supreme Court's decision in *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), in which the successful plaintiff in a Title I suit was awarded fees on principles of equity.

The suggestion that *Landry* applies the standard for awarding fees under Title II of the LMRDA (which contains a fee-shifting provision) to Title I is not supported by the decision. Although the attorneys' fee

award in *Landry* was based on both a statutory fee-shifting provision under Title II and the claims made under Title I, the Fifth Circuit carefully distinguished the award of attorneys' fees under § 102 (which has no express provision for awarding attorneys' fees) and § 201(c) (which does have an express provision for awarding attorneys' fees). It was only under its analysis of § 201(c) that the Fifth Circuit stated that attorneys' fees should be awarded absent special circumstances. *Landry*, 623 F.2d at 350. Conversely, the court speaks in terms of equity when discussing the award under § 102. *Id.* at 351.

Likewise, in *Smith,* which is relied on by plaintiffs, District Judge Gesell based his decision to award attorneys' fees "absent special circumstances rendering such an award unjust" on § 201(c), which explicitly provides for such awards. *Smith,* 723 F.Supp. at 175.

█ This Court will not apply the standard urged by plaintiffs, i.e. that attorneys' fees should be awarded to them "absent special circumstances rendering such an award unjust," to a claim under Title I of the LMRDA. This does not mean, however, that the plaintiffs cannot recover attorneys' fees in this case. It simply means that the Court's analysis will be governed by traditional principles of equity as described in *Hall v. Cole* rather than principles interpreting fee-shifting statutes.

In *Hall* the Supreme Court affirmed an award of attorneys fees in a claim under § 102 of the LMRDA (Title I) on the basis of the court's equity power.

> Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable power, may award attorneys' fees when the interests of justice so require.

412 U.S. at 4–5, 93 S.Ct. at 1945–46 (citations omitted). In the context of a § 102 claim the Court concluded that when the litigation confers a "substantial benefit" on members of an ascertainable group, over which the court has jurisdiction, it is just to spread the costs of this benefit among the group. To do otherwise enriches the group at plaintiff's expense. *Id.* 5–6, 93 S.Ct. at 1946. Reimbursement of a plaintiff's costs and attorneys' fees is thus designed to "shift[ ] the costs of litigation to 'the class that has benefited from them and that would have had to pay them had it brought the suit.'" *Id.* at 9, 93 S.Ct. at 1948 (quoting *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 397, 90 S.Ct. 616, 628, 24 L.Ed.2d 593 (1970)).

Thus, the analysis begins with the determination whether the plaintiffs conferred a common benefit on the union membership so as to justify an award of attorneys' fees. And, if the plaintiffs are to be awarded attorney's fees, the Court must determine, in the exercise of discretion, the appropriate amount of this award. *See Barber v. Kimbrell's Inc.,* 577 F.2d 216, 226 (4th Cir.), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978).

The results to be analyzed in this case were achieved from two aspects of the litigation, the preliminary injunction and the settlement agreement. The preliminary injunction entered in this case on June 8, 1987, reinstated Hayes to the Board of the Union until his later election defeat in December 1988. The settlement obtained on April 25, 1989, included the agreement by the MM & P (1) to pay Hayes' back wages, vacation time, and benefits for the period he was suspended from office; (2) to publish notice in two issues of the Union's newsletter, *Master, Mates & Pilots,* that the Board recommended that Article IX, section 3(a)(5) (the slander and libel section of the Union's constitution) be repealed; and (3) to destroy the ballots cast during the first recall referendum.

With respect to the reinstatement, the MM & P argues that it was personal to Hayes and did not provide a "common benefit" to the Union. It contends that any benefit enjoyed by the Union was incidental to the main benefit which was to Hayes. The plaintiffs, on the other hand, contend that the reinstatement provided an important benefit to the Union because it "eliminated the chilling effects his removal from office might have had not only on mem-

bers, but also on other elected officers, current and future." Plaintiffs also note that Hayes' reinstatement ensured that the Union members who voted for him were represented by the person of their choice.

Both of plaintiffs' arguments on the benefits of reinstatement are supported by the Supreme Court's decisions in *Hall* and in *Sheet Metal Workers' Int'l Ass'n v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989).

In *Hall,* the Supreme Court found that the reinstatement of the plaintiff who had been wrongfully discharged for exercising his free speech rights under the LMRDA provided a common benefit to the union:

> [B]y vindicating his own right, the successful litigant dispels the "chill" cast upon the rights of others. Indeed, to the extent that such lawsuits contribute to the preservation of union democracy, they frequently prove beneficial "not only in the immediate impact of the results achieved but in their implications for the future conduct of the union's affairs."

412 U.S. at 8, 93 S.Ct. at 1948. Similar conclusions were reached in *Sheet Metal Workers' Int'l:*

> [W]hen an elected official ... is removed from his post, the union members are denied the representative of their choice.... Furthermore, the potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members that voted for him.

488 U.S. at ——, 109 S.Ct. at 645.

The Court therefore concludes that the reinstatement of Hayes, which was obtained by a preliminary injunction, provided a benefit for the Union and its members, and to the extent that attorneys' fees were expended in that effort, they will be allocated to all union members by an award of fees in this case.

The plaintiffs in this case also obtained, by way of the settlement agreement, the commitment by the Board to recommend repeal of a portion of the Union's constitution which plaintiffs contended was used to impinge on free speech rights secured by § 102 of the LMRDA. The Settlement Agreement provides:

> Defendant will publish a prominent notice in one of the next two issues of the *Master, Mate & Pilot [Mates & Pilots]* informing the union membership that the General Executive Board will recommend that Article IX, Section 3(a)(5) of the union constitution—which provision shall be set forth in the notice—be repealed at the next convention and will not enforce the provision in the interim.

Article IX, section 3(a)(5) of the MM & P Constitution provides in part:

> The basis for [disciplinary] charges against any member of the Organization shall be as follows: ... Abuse of fellow members by libelous or slanderous communications.

There is support for the argument that this provision, which plaintiffs contend was used to authorize the adoption of the "gag" rule, is illegal. *See Salzhandler v. Caputo,* 316 F.2d 445 (2d Cir.), *cert. denied,* 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963). Indeed, this Court noted in its order denying summary judgment in this case that the provision's legality was "at the very least questionable."

The Union argues that the proposed repeal of the constitutional provision did not provide a common benefit because the provision was supposedly not the reason for the lawsuit, but was only gratuitously included as a basis of the complaint subsequent to its initial filing. The fact remains, however, that the plaintiffs have long argued against the legality of the provision, and the Union did agree to recommend its repeal.

The Court will allocate to the Union those fees attributable to obtaining that portion of the settlement agreement. The remaining fees and expenses incurred in this case by plaintiffs in obtaining back pay, reinstatement of vacation time, and other personal benefits for Hayes are per-

sonal to him and will not be allocated to the Union.

In summary, fees incurred in the preparation of suit and in obtaining the preliminary injunction on June 8, 1987, will be awarded in full. Fees incurred thereafter in pursuing the litigation and obtaining a settlement will be apportioned.

### III.

Counsel for the plaintiffs argue that they are entitled to a "lodestar" amount of $73,925.60 based on the following hours worked by each attorney and the rates claimed:

| ATTORNEY | HOURS | RATE | FEE |
|---|---|---|---|
| Arthur L. Fox | 375.8 | $180 | $67,644.00 |
| Cornish F. Hitchcock | 9.5 | $165 | 1,567.50 |
| Paul Alan Levy | 4.1 | $165 | 676.50 |
| Alan B. Morrison | 3.5 | $210 | 735.00 |
| | | | 70,623.00 |

The remaining $3,302.60 of the claim represents expenses of $1,608.83 incurred by Public Citizen Litigation Group and $1,693.77 incurred by Hayes.

The submissions by counsel for the plaintiffs show that Mr. Fox, whose time represents the bulk of the fees claimed, has no standard billing rate. Prior to 1987 he has sought and obtained fee awards based on rates between $110 and $150 per hour. Mr. Fox is experienced in his field and the Court finds that payment to him of $180 per hour, as claimed in his petition, is not out of line with rates in the community for similar work by similarly experienced attorneys as shown by the data submitted. Similarly, the rates of his colleagues are not out of line.

The submitted data that detailed the time incurred by plaintiffs' counsel in this case have been examined. Consistent with the conclusions reached in this Opinion, all time incurred before June 8, 1987, and thereafter in connection with the injunction will be taxed against the defendant. One-half of the remaining time claimed, which the Court attributes· to obtaining portions of the settlement beneficial to the Union, will also be taxed.

Applying that general finding, the dollar value of 153.7 hours of time incurred by

Mr. Fox and all the time incurred by Messrs. Hitchcock, Levy, and Morrison will be allowed to plaintiffs for the injunction aspects of the case, for a total of $30,645. One-half of the remaining time spent on the litigation, which represents a dollar value of $16,560, will also be allowed. The out-of-pocket expenses of litigation and the fees incurred in the preparation of the fee petition will be awarded on a pro rata basis, allowing that percentage of those expenses and fees equal to the ratio that the allowed litigation fees bear to the total litigation fees claimed, or 70%. On that basis the additional amounts of $4,800.60 in fee-petition fees and $2,219.76 in expenses will also be allowed to plaintiffs.

Accordingly, for the reasons given in this Opinion, it is hereby ORDERED this 3rd day of May, 1990, that plaintiffs' petition for attorneys' fees and expenses is granted in part, and plaintiffs are awarded $54,225.36 in fees and expenses.